[Crim. No. 21117. Nov. 7, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
ELBERT LEE EASLEY, Defendant and Appellant.

## COUNSEL

Roger S. Hanson for Defendant and Appellant.

Quin Denvir, State Public Defender, Joseph Levine, Michael G. Millman, Eric S. Multhaup and Steven W. Parnes, Deputy State Public Defenders, as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp and George Deukmejian, Attorneys General, Daniel J. Kremer and Robert H. Philibosian, Chief Assistant Attorneys General, William D. Stein and Edward P. O'Brien, Assistant Attorneys General, Herbert F. Wilkinson, W. Eric Collins, Eugene W. Kaster and John B. Moy, Deputy Attorneys General, for Plaintiff and Respondent.

Christopher N. Heard as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

KAUS, J.—This is an automatic appeal from a judgment imposing a penalty of death. (Pen. Code, § 1239, subd. (b).)[1] We filed an initial opinion in this case on December 10, 1982, but before the opinion became final (Cal. Rules of Court, rule 24(a)), the State Public Defender filed an amicus curiae brief which brought to our attention a number of significant legal issues that had not been raised by defense counsel or the Attorney General and had not been addressed in the court's opinion. Recognizing that in death penalty cases the provisions of section 1239, subdivision (b) impose "a duty *upon this court* 'to make an examination of the complete record of the proceedings . . . to the end that it be ascertained whether defendant was given a fair trial'" (italics added) (*People* v. *Stanworth* (1969) 71 Cal.2d 820, 833

---

[1]Unless otherwise indicated, all section references are to the Penal Code.

[80 Cal.Rptr. 49, 457 P.2d 889]; *People* v. *Bob* (1946) 29 Cal.2d 321, 328 [175 P.2d 12]; *People* v. *Perry* (1939) 14 Cal.2d 387, 392 [94 P.2d 559, 124 A.L.R. 1123]; *People* v. *Figueroa* (1911) 160 Cal. 80, 81 [116 P. 391]), we granted a rehearing to give full consideration to the new issues.

When our initial decision was filed, the court was unanimous in concluding that the judgment of guilt should be affirmed. Inasmuch as the newly raised issues relate solely to the penalty phase of the trial, the present opinion simply adopts, in parts I and II, the discussion of the facts of the case and the guilt phase issues contained in Justice Richardson's initial opinion for the court. Thereafter, in part III, we address the penalty phase issues, and conclude that at that phase a number of substantial errors occurred which require a remand for a new penalty trial.

## I. Factual Background

Defendant Elbert Lee Easley was convicted by a jury of the first degree murders of Reiner and Sigrid Junghans. (§§ 187, 189.) The jury found that defendant used a deadly weapon, a "pick type instrument," in the commission of the murders. (§ 12022.) The jury also found as special circumstances (1) the murders were intentional and carried out pursuant to an agreement to accept valuable consideration from a person other than the victims (former § 190.2, subd. (a)), and (2) defendant personally committed more than one offense of murder (former § 190.2, subd. (c)(5)). The jury fixed the penalty at death.

We describe the evidentiary web revealed at trial. Reiner and Sigrid Junghans were killed in Modesto on the evening of October 14, 1978. Each was stabbed repeatedly in the head and chest, during which time Sigrid had a rubber ball in her mouth. The pathologist testified that Reiner died from the stab wounds, while Sigrid died from a combination of stab wounds and suffocation caused by the rubber ball.

The prosecution's case rested on the theory that a corporate power struggle had developed between Reiner Junghans and codefendant, Joseph Penka. Two former employees, Raymond Smith (Smith) and Donald Davis (Davis), testified that Penka contracted with them to arrange Reiner's death and that they then contacted Westmoreland, defendant's brother-in-law. Westmoreland testified that he hired defendant to kill Reiner.

Penka's business associate testified at length about the dispute between Penka and Reiner, which stemmed from a power struggle among three corporations in which Penka owned stock. He and Reiner were the principal shareholders in one of those corporations, IMMCO, and Penka was repeat-

edly frustrated in his attempt to wrest control of IMMCO from Reiner. In February 1978, he threatened to "get" those who had opposed him, including Reiner.

Smith and Davis worked for IMMCO until February 1978, when Reiner fired them. One month later, they were arrested and charged with the theft of scrap metal from IMMCO. While departing from a hearing on the theft charge, Penka said to Davis and Smith, "Reiner is going to get his one way or the other." Smith said "The other?" and Penka responded with a threatening gesture.

About two months later, at Davis' urging, Smith called Penka to ask about Reiner. Penka said he was still interested in "taking care of the other," and asked Smith to see what he could do. Smith negotiated with Penka, eventually arriving at a price of $12,500. Penka paid him a down payment of $4,000. Smith made arrangements to have Reiner killed, but the plans fell through.

In late September, Smith and Davis contacted Westmoreland, who agreed to arrange the killing. He went to Fresno to talk to defendant, who said he would kill Reiner for $4,000.

Westmoreland told Davis that he did not have time to do it himself, but would "get Elbert to do it." Smith and Davis located the Junghans' home, and pointed it out to Westmoreland, who showed it to defendant in early October. They agreed that Reiner would be killed by October 15.

On October 13, Penka asked Davis to delay the killing until February. Davis told him it might be too late. Also on October 13, defendant went with his girlfriend, Lorrie Ross, to a farm near Fresno where he obtained baling wire, cutting it with a tool resembling a pair of pliers. At some point during that day, he pawned a carpentry tool, an air nailer, for $30. He used the money to purchase gasoline for his car and drove to Modesto, arriving at Westmoreland's house late that night. Westmoreland testified that he saw baling wire in defendant's bag.

Defendant told Westmoreland he needed a gun. Westmoreland went to see Davis early the next morning, October 14, and Davis gave him a sawed-off shotgun which Davis had bought from his brother Kenneth earlier that morning. Davis himself had sawed off the gun, telling his brother that he was going to sell it to "a couple of guys from Texas."

Westmoreland delivered the gun, wrapped in a sweater, to defendant who told him that he would hide the gun in the sweater until the door was

opened, then pull it out and use it to force entry into the house. He practiced handling the gun and sweater.

That same morning, Westmoreland and defendant purchased an icepick and two rubber balls. At approximately noon, defendant left Westmoreland's home with baling wire in his belt loops, carrying the shotgun and icepick. He returned in half an hour, saying that Reiner was not home.

Defendant left again about 5:30 or 6 p.m. He called Westmoreland between 8 and 8:30 p.m. and said it was over. Westmoreland met him at a store, where defendant said he had killed Reiner and Sigrid, and gave Westmoreland Reiner's wallet. Westmoreland directed defendant to wait for him at a diner and drove to Davis' house. He told Davis the Junghans were dead and "Elbert wants his money." Davis called Penka's house several times, but received no answer. He eventually left a message with a woman at the house. About 10 p.m. Penka returned Davis' call and arranged to meet him. Within 10 minutes Penka arrived with $5,000. Davis gave the money to Westmoreland, who kept $1,000 and gave the remainder to defendant.

A bank official testified that she cashed two checks totalling $5,000 for Penka on October 6. She gave him bundles of $20 bills, fastened together with rubber bands.

Lorrie Ross testified that upon his arrival at her home in Fresno at 11 or 12 o'clock on the night of October 14, defendant showed her an envelope containing $4,000 in $20 bills secured by rubber bands, and told her he had robbed a bar. The next day, they visited defendant's uncle and repaid him $600 that defendant had borrowed from him, paying it entirely in $20 bills. Defendant also rented an apartment, bought a headstone for his daughter's grave for $350, spent $100 at a department store, $75 for clothing and $100 for groceries, and gave $200 to Ross' relatives. He and Ross spent two nights at a motel and ate at restaurants, and on October 17, purchased a car for $1,556, paying with $20 bills.

The bodies of Reiner and Sigrid were discovered on October 16. Baling wire was found wrapped loosely around one of Sigrid's wrists and the rubber ball was in her mouth. Reiner's hands and feet were tied with similar wire and a rubber ball was next to his body. Four loose pieces of baling wire were found outside the home. Newspapers dated October 15 and 16 were at the front door. A friend testified that she had talked to Junghans at about 7:15 p.m. on October 14, and that it was agreed that they would pick her up at her home at 7:30. When they did not arrive, she called their home repeatedly, beginning at 8 p.m., but received no answer. Based on this

information and the condition of the bodies, the pathologist concluded that they had been killed on the evening of October 14.

The police found a small piece of paper on the floor near Sigrid's body, containing the name, "Dave Balch," and two addresses. (Dave Balch was never identified at trial. Westmoreland testified that defendant had planned to obtain entry to the Junghans' home by showing a note to the person who answered the door and asking for directions.) A fingerprint on this paper was identified as defendant's. The officers also discovered a shotgun, bearing Kenneth Davis' fingerprint, on the kitchen table. They were unable to locate Reiner's wallet.

On November 2, 1978, the police executed a search warrant for defendant's apartment and his two cars. They seized a pair of wire cutters from one of the automobiles, and a state criminologist testified that the markings on the wire cutters matched those on the baling wire removed from the victims' bodies, concluding that the wire cutters had been used to cut the baling wire.

Testifying in his own behalf defendant asserted his innocence. He denied having had any conversations with Smith, Davis or Westmoreland concerning any killing. He acknowledged visiting Westmoreland on October 13 and 14 and although Westmoreland borrowed his car, defendant did not leave the house. Defendant spent the evening of the 14th at Jalisco's restaurant in Fresno, and a witness Jose Hernandez testified that he remembered seeing defendant at Jalisco's on the evening of October 14.

Defendant was unable to explain telephone company records which revealed a call at 6 p.m. on October 14 from Westmoreland's residence in Modesto to the halfway house in Fresno where defendant then lived. Records at the halfway house indicated that defendant had called to check in about 6 p.m. on that evening.

Defendant testified that he had $2,880 in cash, mostly in $20 bills, on the weekend of October 14, a combination of loans and payment for his work as a carpenter. He said that he had pawned the air nailer because he had left his money at Ross' house and needed cash to purchase gasoline.

He denied that he had purchased rubber balls or an icepick with Westmoreland, or had owned wire cutters such as those found in his car. He explained that he went with Ross to obtain baling wire in order to fix the muffler and license plate on his car. Kathy Ross, Lorrie's sister, confirmed that defendant had told her that he needed baling wire to fix his muffler.

On July 5, 1979, the jury found defendant guilty of both murders with special circumstances.

At the penalty phase of the trial, the prosecution presented evidence of defendant's prior criminal activity (see former § 190.3, subd. (b)), namely, the arson for hire of the Chicken Ranch brothel in Pahrump, Nevada.

The evidence included a telegram containing the message, "You have a job over here" sent to defendant by Bill Martin, together with a $50 money order. There was evidence tending to show that defendant had been in Nevada, staying with Bill Martin, in June 1978. Further evidence indicated that Martin, who owned a competitive brothel, was engaged in a conspiracy with others either to extort money from the owner of the Chicken Ranch or to close it.

An employee of the Chicken Ranch brothel testified that on the night of June 10, 1978, a man ran into the brothel and threw something inside. The building immediately burst into flames. She thereupon wakened the occupants, all of whom escaped safely. The employee first testified that she had not seen the man's face and could not identify him, but subsequently testified she remembered the man had a long nose and resembled defendant.

Ross testified that defendant left for Las Vegas in April or May of 1978. Meeting again with her in late May or June in a motel in Fresno, he showed her approximately $700, and said he had "burnt down a whorehouse" called "the Chicken Ranch."

Defendant's mother, father and three children testified that he was a nonviolent and attentive son and father who was a faithful attendant at church.

The jury returned a verdict of death. This appeal follows automatically. (See § 1239, subd. (b).)

## II. Guilt Phase Issues

Four claims of error in the guilt phase of his trial are asserted.

### A. *Exclusion of Jurors*

■ Defendant argues that the exclusion for cause of prospective jurors who indicated that they would automatically vote against the death penalty deprived him of a fair and impartial jury on the issue of guilt. In *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 68 [168 Cal.Rptr. 128, 616 P.2d 1301], we held that there was, as yet, insufficient evidence to demonstrate that a

California death-qualified jury resulted in a nonneutral jury. No new evidence to support this contention has been presented. For reasons described in *Hovey,* the claim lacks merit.

### B. *Validity of Search Warrant*

Defendant asserts the invalidity of the warrant authorizing a search of his residences and automobiles. He argues that two pieces of evidence seized pursuant to that search, the wire cutters and a receipt for the telegram from Bill Martin, should have been suppressed. The wire cutters, seized from defendant's automobile, were identified by an expert at trial as the tool used to cut the baling wire found on the victims' bodies. The receipt for the telegram was discovered in defendant's home and introduced at the penalty phase.

His challenge to the search warrant was on the following grounds: (1) it was issued by a Stanislaus County judge authorizing a search in Fresno County; (2) the warrant authorized a search for the same items in four separate locations; (3) the affidavit supporting the warrant omitted material information that cast doubt on the reliability of two informants; and (4) the police seized objects outside the scope of the warrant.

Defendant acknowledges that these attacks on the search warrant were not raised in the trial court. We have recently held that "[q]uestions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal. [Citations.]" (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048]; see Evid. Code, § 353.)

While acknowledging the foregoing principle, defendant urges us to reach the merits of his suppression claim on the ground that his trial counsel's failure to raise the issue in the trial court constituted a denial of the effective assistance of counsel. In order to establish such inadequacy, he must demonstrate that counsel's failure to object to the introduction of the evidence below constituted a failure to provide "reasonably competent representation." (*People* v. *Pope* (1979) 23 Cal.3d 412, 424-425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Defendant has failed to meet this burden as to any of his challenges to the search warrant. Our review is limited to consideration of the facts established by the appellate record.

We recently held that a magistrate has jurisdiction to issue a warrant for an out-of-county search "when he has probable cause to believe that the evidence sought relates to a crime committed within his county and thus

pertains to a present or future prosecution in that county." (*People* v. *Fleming* (1981) 29 Cal.3d 698, 707, fn. omitted [175 Cal.Rptr. 604, 631 P.2d 38].) In this case, the search warrant sought evidence relating to two homicides committed in Stanislaus County. The magistrate had probable cause to believe that evidence relevant to those crimes might be found in defendant's residences and automobiles. He therefore had jurisdiction to issue a warrant for an out-of-county search for that evidence.

■ Defendant's second argument, that the warrant was invalid because it authorized a search for the same property in four separate locations, is similarly without merit. The warrant authorized a search of two residences, the Ross house where defendant had lived part time before the weekend of the homicides, and the apartment which he and Lorrie Ross had rented four days after the killings. The warrant also authorized a search of defendant's two automobiles, a Chevrolet which he had owned for some time and a Buick purchased shortly after the homicides.

The only issue raised as to such a warrant is whether the supporting affidavit establishes probable cause to search each of the places listed. A search warrant designating more than one person or place to be searched must contain sufficient probable cause to justify its issuance as to each person or place named therein. (See *People* v. *Nadell* (1972) 23 Cal.App.3d 746, 752 [100 Cal.Rptr. 444]; see also 17 Cal.Jur.3d, Criminal Law, § 341, pp. 597-598.) The affidavit in question established that defendant had obtained baling wire one day before the killings; that he was in Modesto on the day of the murders; that his fingerprint had been found on a piece of paper which was lying next to one of the victims; and that he had purchased a car and rented an apartment, paying large sums of money in cash, within four days after the homicides. On the basis of this information, the magistrate properly concluded that there was probable cause to believe that evidence of the crime could be found at either of defendant's residences or in either of his cars.

In this connection, defendant's argument apparently rests on the erroneous theory that a warrant which authorizes the search of more than one location for the same property is per se invalid. He urges that the authorization to search four different places demonstrates that the affiant did not know where the sought-after property actually was located. However, "certainty is not required" to justify issuance of a search warrant. (*People* v. *Watson* (1979) 89 Cal.App.3d 376, 385 [152 Cal.Rptr. 471].) There is no logical inconsistency in the conclusion that an affidavit establishes probable cause to believe that evidence of a crime will be in any one of a suspect's homes or vehicles.

Defendant next asserts that the affidavit supporting the search warrant intentionally omitted material information. ■ In challenging a search warrant based on an affidavit containing omissions, a defendant bears the burden of showing both that there were omissions and that they were material. (*People* v. *Kurland* (1980) 28 Cal.3d 376, 390 [168 Cal.Rptr. 667, 618 P.2d 213].) A fact is material if its "omission would make the affidavit *substantially misleading.*" (*Id.,* at p. 385, italics in original.) That is, the omission is material if "there is a substantial possibility [that its inclusion] would have altered a reasonable magistrate's probable cause determination." (*Ibid.*) If an omission is immaterial, the warrant will not be quashed unless the defendant can show that information was intentionally omitted in order to mislead the magistrate or in reckless disregard of the accuracy of the warrant. (*Id.,* at pp. 387, 390.)

■ Defendant claims that two pieces of material information were omitted. First, the affidavit relied on information supplied by Lorrie Ross, to the effect that she went with defendant to obtain baling wire shortly before the date of the murders, and that he returned the night of the killings, told her that he and an accomplice had committed a robbery and tied people up with baling wire, and showed her $4,000 which he said was his share of the money from the robbery. The affidavit failed to note that two weeks before the homicides Lorrie Ross asked a relative where she and defendant could obtain baling wire.

Defendant now argues that this omitted information was material because it indicated that Ross was an accomplice in defendant's alleged crime, and therefore cast doubt on the reliability of the information which she supplied to the police. However, the omitted fact was merely cumulative. The affidavit contained information which implicated Ross in the trip to obtain baling wire. Thus, the magistrate knew that she was a possible accomplice. There is no "substantial possibility" that inclusion of the fact that Ross had inquired about baling wire could have altered the probable cause determination. (*People* v. *Kurland, supra,* 28 Cal.3d at p. 385.)

The second omitted fact was similarly immaterial. The affidavit quoted a business partner of Reiner's, who said that Reiner had told him that he was afraid of an unnamed cousin of Smith and Davis. The business partner also said that an IMMCO employee, Craig Brown, had told him that Smith and Davis had a cousin who had been in prison for murder. The affidavit stated that the affiant contacted Brown and asked him for the cousin's name. Brown said the cousin was Easley. The affidavit omitted the information that Brown was involved in collecting the payment Smith and Davis received when they stole scrap metal from Reiner's business.

Defendant claims that this omitted information cast doubt on Brown's credibility. However, the information supplied by Brown was not material to the affidavit. Brown's information did little more than explain how the police obtained defendant's name. The additional information in the affidavit—including the discovery of defendant's fingerprint at the scene of the crime—adequately established probable cause to search his homes and automobiles. Inclusion of the omitted information about Brown could not have altered the probable cause determination.

Defendant has thus failed to demonstrate that material information was omitted from the affidavit. In addition, he has pointed to no evidence to support his claim that the information was omitted with the intent to mislead the magistrate or in reckless disregard of the accuracy of the warrant. (*People* v. *Kurland, supra,* 28 Cal.3d at pp. 387-388, 390.) On this record, which is admittedly incomplete because of the failure to litigate this claim in the trial court, it must be concluded that the omissions from the affidavit did not require the quashing of the search warrant.

■ Finally, defendant argues that the seizure of the wire clippers was improper because the clippers were not listed in the search warrant. However, items not named in a warrant may be seized if the police officer is " 'presently aware of some specific and articulable fact from which a rational link between the item seized and criminal behavior can be inferred. . . .' " (*People* v. *Superior Court* (*Meyers*) (1979) 25 Cal.3d 67, 73-74 [157 Cal.Rptr. 716, 598 P.2d 877], quoting *People* v. *Hill* (1974) 12 Cal.3d 731, 763 [117 Cal.Rptr. 393, 528 P.2d 1].) The police officer in this case was authorized to search for baling wire. Defendant has pointed to no evidence to rebut the obvious inference that the officer knew that the wire clippers might have been used to cut the baling wire. ■ He has not met his burden of showing that the failure to challenge the search warrant on this or any other ground amounted to ineffective assistance of counsel.

## C. *Hearsay Testimony of Davis*

■ Defendant objects to the admission into evidence of Davis' testimony as to numerous statements made to him by Westmoreland that implicated defendant. Davis testified that when he and Smith first approached Westmoreland, Westmoreland told them, "I'll get Elbert to do it [the killing]." Later, when Davis told Westmoreland that Penka wanted to postpone the killing, Westmoreland replied that it was too late because "Elbert is already here." After the homicides, Westmoreland told Davis, "Elbert is at the Snow White Drive-In eating a hamburger and he wants his money," and also said, "Elbert took care of her [Sigrid Junghans] too." He argues that two of the statements were inadmissible hearsay, outside the scope of

the coconspirator's exception to the hearsay rule (Evid. Code, § 1223) because they were made after the killings and thus after the termination of the conspiracy. He also contends that the introduction of the statements violated his constitutional right to confrontation, under the holding of *Dutton* v. *Evans* (1970) 400 U.S. 74 [27 L.Ed.2d 213, 91 S.Ct. 210].

The Attorney General correctly notes that there was no objection to the introduction of the hearsay statements at trial. ▮▮▮ Issues relating to the admissibility of evidence will not be considered on appeal absent a timely objection in the trial court. (*People* v. *Rogers, supra,* 21 Cal.3d 542, 548.) ▮▮▮ In addition, defendant's claims are without merit.

First, defendant errs in assuming that the conspiracy ended with the deaths of Reiner and his wife. Where payment of money is a crucial objective of a conspiracy, and a coconspirator's statement is made shortly after the substantive crime is committed but before the money is paid, the coconspirator's statements may be admissible under the coconspirator exception to the hearsay rule. (*People* v. *Saling* (1972) 7 Cal.3d 844, 852 [103 Cal.Rptr. 698, 500 P.2d 610]; *People* v. *Leach* (1975) 15 Cal.3d 419, 428-432 [124 Cal.Rptr. 752, 541 P.2d 296].) Independent evidence of the continuing nature of the conspiracy is necessary. (*Id.,* at p. 432.) Here, there was ample independent evidence that the conspiracy continued until defendant received his share of the payment for the homicides. Westmoreland's statements to Davis after the killings but before defendant was paid clearly were made in furtherance of the conspiracy and therefore fall within the coconspirator's exception.

Defendant's second claim equally lacks merit. Although the admission of some hearsay may violate the confrontation clause of the United States Constitution (*Bruton* v. *United States* (1968) 391 U.S. 123, 126 [20 L.Ed.2d 476, 479, 88 S.Ct. 1620]), the right to confrontation does not bar the use of all hearsay (*Dutton* v. *Evans, supra,* 400 U.S. at p. 80 [27 L.Ed.2d at p. 222]). The United States Supreme Court has expressly declared that the rule of *Bruton* and *Dutton* "is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross-examination." (*Nelson* v. *O'Neil* (1971) 402 U.S. 622, 627 [29 L.Ed.2d 222, 227, 91 S.Ct. 1723], italics in original; see also *People* v. *Steger* (1976) 16 Cal.3d 539, 551 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; *In re Rosoto* (1974) 10 Cal.3d 939, 951-952 [42 L.Ed.2d 141, 95 S.Ct. 177]; *People* v. *Brown* (1978) 79 Cal.App.3d 649, 656-657 [145 Cal.Rptr. 130].) Here, Westmoreland testified at trial and was cross-examined at length about his statements. Defendant's right of confrontation was not violated.

## D. *Accomplice Instructions*

 The trial court instructed the jury that Davis, Smith and Westmoreland were accomplices as a matter of law. (§ 1111.) The question of whether Kenneth Davis was also an accomplice was submitted to the jury. Defendant contends that it was error to submit this issue to the jury, arguing that the jury should have been instructed that Kenneth was an accomplice as a matter of law. (Defendant also argues that it was error not to require the jury to complete a separate verdict sheet recording their decision on whether Kenneth was an accomplice. No authority is cited for this proposition, and no such requirement is established by *People* v. *Tewksbury* (1976) 15 Cal.3d 953 [127 Cal.Rptr. 135, 544 P.2d 1335].)

Both Kenneth and Donald Davis testified that Donald came to Kenneth's house on the morning of October 14 and offered to purchase a shotgun that Kenneth had for sale. Kenneth testified that his brother told him he planned to sell the gun "to a couple of guys from Texas." While at Kenneth's house, Donald "sawed off" the shotgun. Kenneth testified that he learned two weeks later that the gun had been used in a murder.

We have held that an accomplice is "one who is liable to prosecution for the identical offense charged against the defendant . . . ." (§ 1111.) Further, "Whether a person is an accomplice is a question of fact for the jury unless there is no dispute as to either the facts or the inferences to be drawn therefrom." (*People* v. *Tewksbury, supra,* 15 Cal.3d at p. 960.)

In this case, the question of whether Kenneth Davis was an accomplice was properly submitted to the jury. If the jury believed Kenneth's testimony, it reasonably could have found that he did not know that the shotgun would be used in the commission of murder and, therefore, was not an accomplice in the murders. This question of fact was for the jury to resolve.

## III. PENALTY PHASE ISSUES

Defendant, adopting the arguments initially raised by the State Public Defender in an amicus brief urging a rehearing, maintains that the trial court made a number of serious errors in instructing the jury at the penalty phase of the trial. In particular, he suggests that the court erred (1) in informing the jury at the penalty phase that it must not be influenced by "pity" or "sympathy" for the defendant, and (2) in instructing the jury under the provisions of the *1978* death penalty law rather than under the *1977* death penalty law which was in effect at the time the crimes at issue

were committed.[2] We conclude that the trial court did err in both of these respects and that the errors require a remand for a new penalty trial.[3] Accordingly, we do not reach other penalty issues raised by defendant.

## A. *Instruction Not to Be Influenced by Sympathy*

At the penalty phase, the trial court instructed the jury pursuant to CALJIC No. 1.00: "As jurors, you must not be influenced by pity for a defendant or by prejudice against him. You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling."

Although this instruction is one of the general introductory instructions routinely given in *noncapital* cases and at the *guilt phase* of capital cases, over a decade ago, in *People v. Bandhauer* (1970) 1 Cal.3d 609, 618 [83 Cal.Rptr. 184, 463 P.2d 408], we explicitly condemned the giving of a virtually identical instruction[4] at the penalty phase of a capital case, explaining that "[w]e have repeatedly held that it is error to instruct the jury at a penalty trial not to consider sympathy for the defendant in reaching its verdict. (*People v. Polk* (1965) 63 Cal.2d 443, 451 [47 Cal.Rptr. 1, 406 P.2d 641]; *People v. Anderson* (1966) 64 Cal.2d 633, 641-642 [51 Cal.Rptr. 238, 414 P.2d 366]; *People v. Friend* (1957) 47 Cal.2d 749, 767-768 [306 P.2d 463].)"

The Attorney General argues that *Bandhauer* and the cases on which it relies are no longer valid because the jury does not have "unlimited discre-

---

[2]Under section 1259, the validity of these instructions is cognizable on appeal despite the absence of any objection at trial. (See, e.g., *People v. Harris* (1981) 28 Cal.3d 935, 956 [171 Cal.Rptr. 679, 623 P.2d 240].) The Attorney General argues that defendant should be precluded from challenging these instructions because his counsel requested that they be given. The record, however, does not support the Attorney General's assertion that the instructions were given at defense counsel's request, nor does it suggest that defense counsel sought to achieve any tactical advantage through the giving of such instructions. Under these circumstances, the authorities make clear that defendant's present objections are not barred under an "invited error" theory. (See, e.g., *People v. Graham* (1969) 71 Cal.2d 303, 319 [78 Cal.Rptr. 217, 455 P.2d 153]; *People v. Barraza* (1979) 23 Cal.3d 675, 683-684 [153 Cal.Rptr. 459, 591 P.2d 947].)

[3]Contrary to the dissent's assertion, there is absolutely nothing in this record which suggests that defense counsel was aware of these issues before they were raised by amicus or that he deemed them "too insignificant to raise on appeal." (P. 887, *post.*) As we shall explain, the errors here are of considerable significance: in one instance, the error involves the giving of an instruction which we have repeatedly held should not be given at the penalty phase of a death penalty case and which has been found to constitute reversible error in past decisions; in the other, the error involves nothing less than instructing the jury under the wrong death penalty law. Under these circumstances, it belies reality to suggest that defense counsel "deemed" the errors "too insignificant" to raise on appeal; more reasonably, it can be assumed that defense counsel simply failed to recognize the errors.

[4]The instruction in *Bandhauer* read: "The law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, public opinion or public feeling."

tion" to exercise sympathy as it did before the United States Supreme Court decisions in *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726] and *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909]. In our recent opinion in *People* v. *Robertson* (1982) 33 Cal.3d 21, 57-58 [188 Cal.Rptr. 77, 655 P.2d 279], however, we rejected this very contention, explaining that the federal cases following *Furman* and *Gregg* do not undermine this line of California authority, but, on the contrary, establish that these decisions are compelled as a matter of federal constitutional law. As we noted in *Robertson,* the Supreme Court's decisions in *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954] and *Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869] "make it clear that in a capital case the defendant is constitutionally entitled to have the sentencing body consider any 'sympathy factor' raised by the evidence before it." (33 Cal.3d at p. 58; see also *Woodson* v. *North Carolina* (1976) 428 U.S. 280, 304 [49 L.Ed.2d 944, 961, 96 S.Ct. 2978] (plurality opn.); *People* v. *Haskett* (1982) 30 Cal.3d 841, 863 [180 Cal.Rptr. 640, 640 P.2d 776].)

Attempting to distinguish this case from *Robertson,* the Attorney General points out that because the sympathy issue in *Robertson* arose in response to a prosecutor's argument rather than to a jury instruction, our court did not pass on the propriety of the particular instruction at issue here. He argues that because the instruction told the jury that it should not be swayed by "*mere* sentiment [or] sympathy" (italics added), the instruction could be interpreted to mean only that the jury should not be influenced by sympathy unrelated to any facts revealed by the evidence—"factually untethered sympathy." He maintains that, as so interpreted, the instruction would be valid under *Lockett, Eddings* and *Robertson.*

The instruction that was given, however, was not by its terms limited to "factually untethered" sympathy, but simply told the jury that "you must not be influenced by pity for a defendant" and "you must not be swayed by mere sentiment [or] sympathy." In light of the teaching of *Lockett, Eddings,* and *Robertson,* we have no doubt but that it was error for the trial court to give such an instruction at the penalty phase. Indeed, the drafters of the instruction in question have recognized as much, for the current "use note" accompanying this CALJIC instruction specifically states: "This instruction 1.00 *should not be used in the penalty phase of a capital case* as it admonishes the jury not to be influenced by pity for defendant. CALJIC 8.84.1 and 8.84.2 [which set forth the consideration of aggravating and mitigating factors from Penal Code section 190.3] more properly cover the subject." (Italics added.)[5]

---

[5]This "use note" appears in the 1982 pocket part to CALJIC. It is not clear whether a similar use note accompanied the CALJIC instruction at the time of defendant's trial. The

The Attorney General argues alternatively that even if this instruction should not have been given, the error was not prejudicial in light of an additional instruction—CALJIC No. 8.84.1—which informed the jury of the specific aggravating and mitigating factors which it should consider in determining punishment.[6] Although nothing in CALJIC No. 8.84.1 expressly advised the jury that it could take into account sympathy for the defendant, the instruction did tell the jury that it should consider, among other enumerated factors, "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime."[7] The Attorney General maintains that in light of this instruction the jury must have recognized that it could properly consider any "sympathy factor" raised by the evidence.

Amicus contends, however, that CALJIC No. 8.84.1 not only failed to cure the trial court's erroneous no-sympathy instruction, but that it was itself constitutionally defective. Amicus points out that in *Lockett* and *Eddings,* the United States Supreme Court held that a sentencing jury may

---

1970 edition of CALJIC did contain a similar cautionary note, warning against the use of this general instruction at the penalty trial of a capital case. When a new edition of CALJIC was published in 1979, however, this cautionary use note—for some unexplained reason—was omitted.

[6]The instruction as given provided in full: "In determining which penalty is to be imposed on each defendant, you shall consider all of the evidence which has been received during any part of the trial in this case. You shall consider, take into account and be guided by the following factors, if applicable: First, the circumstances of the crime of which the defendant was convicted in the present proceedings, and the existence of any special circumstances found to be true. [¶] Secondly, the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence, or the expressed or implied threat to use force or violence. [¶] Three, the presence or absence of any prior felony conviction. [¶] Four, whether or not the defense—whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance. [¶] Five, whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act. [¶] Next, whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct. [¶] Next, whether or not the defendant acted under extreme duress, or under the substantial domination of another person. [¶] Next, whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the [e]ffects of intoxication. [¶] Next, the age of the defendant at the time of the crime. [¶] Next, whether or not the defendant was an accomplice to the offense, and whether or not his participation in the commission of the offense was relatively minor. [¶] And lastly, any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime."

[7]As discussed in more detail below, the instruction in question was based on the language of the 1978 death penalty law, rather than the 1977 death penalty law which was in effect when the offenses in question were committed. For purposes of the present issue, however, this difference is immaterial, because the statutory language on which the Attorney General relies—"any other circumstance which extenuates the gravity of the crimes"—appears in identical form in both the 1977 and 1978 law. (See former § 190.3, subd. (j), now § 190.3, subd. (k).)

"not be precluded from considering as a mitigating factor, *any aspect of a defendant's character* or record and any of the circumstances of the offense *that the defendant proffers as a basis for a sentence less than death*." (Italics omitted and added.) (438 U.S. at p. 604 [57 L.Ed.2d at p. 990]; 455 U.S. at p. 110 [71 L.Ed.2d at p. 8].) CALJIC No. 8.84.1—while listing a variety of aggravating and mitigating factors—does not explicitly inform the jury that it may consider *any* mitigating factor proffered by the defendant. Amicus acknowledges that the plurality opinion in *People v. Frierson* (1979) 25 Cal.3d 142, 178 [158 Cal.Rptr. 281, 599 P.2d 587], apparently viewed the concluding statutory factor—"any other circumstance which extenuates the gravity of the crime"—as an open-ended, catchall provision, allowing the jury's consideration of any mitigating evidence.[8] Amicus maintains, however, that even if that clause may be so interpreted in order to save the statute's constitutionality under *Lockett* and *Eddings,* a jury that is not specifically informed of that interpretive gloss could reasonably construe the instruction's language to permit consideration only of circumstances that relate to the "gravity *of the crime*" and not of circumstances that relate to the general character, family background or other aspects *of the defendant.*[9] Since the instruction here did not embody any clarifying interpretation, amicus concludes that it was inadequate and misleading and was itself prejudicial.

██ Although there is some force to amicus' argument that the wording of the instruction in question is potentially confusing,[10] we need not determine whether instructing the jury pursuant to CALJIC No. 8.84.1 was in itself sufficiently misleading to require a retrial of the penalty phase.

██ Here, of course, the trial court not only failed affirmatively to advise the jury that it *could* consider as a mitigating factor any aspect of the defendant's character or background, but it expressly—and inaccurately—informed the jury that it *must not* be influenced by sympathy or pity for the defendant. Whether or not CALJIC No. 8.84.1, taken alone, is inadequate or prejudicial, it certainly did not cure the error arising from the instruction

---

[8]Actually, in *Frierson* the defendant's argument was that the instruction was too broad. Our response was that it was no broader than *Lockett* required. This still leaves open the question whether it was narrower than *Lockett* and *Eddings* permit.

[9]In *Sandstrom v. Montana* (1979) 442 U.S. 510, 514 [61 L.Ed.2d 39, 45, 99 S.Ct. 2450], the Supreme Court observed in another context that "whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction."

[10]In order to avoid potential misunderstanding in the future, trial courts—in instructing on the factor embodied in section 190.3, subdivision (k)—should inform the jury that it may consider as a mitigating factor "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime" and any other "aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death." (*Lockett, supra,* 438 U.S. at p. 604 [57 L.Ed.2d at p. 990].)

precluding jury consideration of sympathy.[11] Indeed, even if there were some ambiguity in this regard, a retrial of the penalty phase would be called for. As Justice O'Connor stated in her concurring opinion in *Eddings*: "*Woodson* and *Lockett* require us to remove any legitimate basis for finding ambiguity concerning the factors actually considered by [the sentencing body in imposing a judgment of death]." (455 U.S. at p. 119 [71 L.Ed.2d at p. 14].)

Finally, the Attorney General maintains that even if the no-sympathy instruction should not have been given, and even if the error was not cured by CALJIC No. 8.84.1, we should nonetheless find the error harmless. He argues that in view of the brutal nature of the murders in this case, there is no "reasonable possibility" that the jury would not have returned a death penalty sentence even if the instruction had not been given, and he urges the court to uphold the death penalty on that basis.

Although the aggravating factors in this case were substantial—the killings were unusually cold-blooded and Easley was a hired killer and arsonist— Easley did present considerable testimony at the penalty phase through which he attempted to demonstrate redeeming features of his character and background to evoke jury sympathy to spare his life. Both his mother and father testified that he was a loving and devoted son, who assisted them financially, with household repairs and in many other ways. His mother stated that "anytime we needed him or one of us got sick, he was the first one there." His three children testified that he was a good father, treated them well, bought them toys and spent time with them. Several friends confirmed his loving relationships with his own as well as with his friends' children. Three correctional officials who had had considerable contact with Easley—his parole officer and the director and assistant director of a halfway house at which he lived for several months in the year preceding the crimes—also testified on his behalf, stating that he was nonviolent, got along well with others and generally had a good employment record as a finish carpenter. In addition, all of the witnesses testified that in the six-month period preceding the killings in this case, Easley was extremely distraught over the murder of his 12-year-old daughter by a man in whose care he had left her.

---

[11]In his closing argument, the prosecutor told the jury that sympathy was not one of the mitigating factors which the law authorized it to consider: "Justice, as best can be defined, has been defined so by the law. The factors that you consider in mitigation, the factors that you consider in aggravation are factors which the law says shall be considered. And if you shall find aggravation overweighs mitigation, based on the factors, then you shall find death and that the death penalty is justice. So what you have to do as jurors is to try to follow that law, to throw away your own thoughts that might cause you to react in an arbitrary or emotional fashion. You're not to do this with sentiment or sympathy. You are to do this following the law."

Of course, we cannot know whether the jury would have returned the same verdict if it had been accurately instructed that it could properly be influenced by sympathy or pity for Easley. By directing the jury not to be swayed by sympathy or pity, however, the court in effect told the jury not to give any weight to the bulk of the evidence proffered by the defendant. Thus, the instruction may very well have eliminated any chance Easley had to escape the death penalty.

In addition, by advising the jury at the outset of the instructions that it was not to be influenced by sympathy or pity, the court significantly misled the jury with respect to the fundamental nature of its sentencing task. As Justice Mosk explained in *People* v. *Haskett, supra,* 30 Cal.3d at page 863: "Although appeals to the sympathy or passions of the jury are inappropriate at the guilt phase [citation], at the penalty phase the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. It is not only appropriate, *but necessary,* that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience. [Citations.]" (Italics added.) In view of the gravity of the instructional error, we conclude that it must be considered prejudicial.

The United States Supreme Court's decision in *Eddings* v. *Oklahoma, supra,* 455 U.S. 104, confirms this conclusion. In *Eddings,* the Supreme Court found that the trial court had committed reversible error when, in sentencing a defendant to death, the court "stated that 'in following the law,' [it] could not 'consider the fact of this young man's violent background.'" (455 U.S. at pp. 112-113 [71 L.Ed.2d at pp. 10-11].) The *Eddings* court reasoned: "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence. *In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf.* The sentencer . . . may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration." (Italics omitted and added.) (*Id.* at pp. 113-115 [71 L.Ed.2d at pp. 10-11].) The case before us, of course, parallels the illustrative example given in *Eddings,* for here the court's instruction not to consider sympathy effectively required the jury to disregard much of the evidence which Easley had presented at the penalty phase. Thus, under *Eddings* and *Lockett,* Easley is entitled to a new penalty trial before a jury that is properly instructed that it may take sympathy into account in determining whether he should live or die.

## B. *Instruction Pursuant to Wrong Death Penalty Law*

The murders in this case occurred on October 14, 1978, about three weeks before the 1978 death penalty initiative was enacted at the November 1978 General Election. Therefore the death penalty statute passed by the Legislature in 1977 (Stats. 1977, ch. 316, §§ 1-26, pp. 1255-1266) was still in effect. Nevertheless, when the trial court instructed the jury at the penalty phase, it used—from all appearances, inadvertently[12]—a CALJIC instruction modeled upon a provision of the 1978 initiative which differed in two significant respects from that called for by the applicable 1977 provision. The instruction that was given (1) altered the scope of the jury's sentencing discretion and (2) added a new aggravating circumstance to be considered by the jury. Defendant contends that the error in instructing the jury pursuant to the wrong death penalty statute provides an additional and independent basis upon which a new penalty trial must be granted. The point is well taken.

### 1. *Jury's Sentencing Discretion*

The most significant difference between the 1977 provision—former section 190.3—and the 1978 provision—the current section 190.3—lies in the scope of the discretion afforded the jury in choosing between a sentence of death and one of life without possibility of parole. Both the former and current versions of section 190.3 direct the jury to "consider, take into account and be guided by the aggravating and mitigating circumstances" enumerated by the court. Former section 190.3, however, contained no further guidance or limitation on the jury's sentencing discretion, providing simply that the jury—after considering the aggravating and mitigating circumstances—"shall determine whether the penalty shall be death or life imprisonment without the possibility of parole."[13] By contrast, section 190.3 as amended by the 1978 initiative provides specific directions for the jury's exercise of its sentencing power, decreeing that the jury—after considering the aggravating and mitigating circumstances—"*shall impose* a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances. If [it] determines that the mitigating circum-

---

[12]Nothing in the record before us indicates that there was any discussion in the trial court with respect to this instruction. In all probability, at the time of trial in June 1979, the trial judge simply reached for the most current CALJIC death penalty instructions, which were the instructions that had been redrafted in light of the 1978 initiative.

[13]Former section 190.3 read in relevant part: "After having heard and received all of the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole."

stances outweigh the aggravating circumstances [it] *shall impose* a sentence of confinement in state prison for a term of life without the possibility of parole."[14] As noted, in this case the trial court instructed the jury under the 1978, rather than the 1977, provision.[15]

Defendant, again adopting the arguments first advanced by amicus, levels a two-pronged attack on the giving of the instruction in question. First, he contends that the trial court was not statutorily authorized to use the provisions of the 1978 law, and that a reversal is required because the 1978 provision reduced the latitude which the 1977 law afforded a jury to exercise discretion in favor of a sentence of life imprisonment without possibility of parole. Second, he contends that even if the giving of the 1978 instruction could be sustained as a statutory matter, the 1978 instruction is unconstitutional insofar as it *requires* a jury to return a judgment of death whenever aggravating circumstances "outweigh" mitigating circumstances, even if the jury does not believe that the "net" aggravation in a particular case is sufficient to make death the appropriate punishment. Because we conclude that the statutory contention has merit, we need not reach the constitutional question in this case.

---

[14]Current section 190.3 reads in relevant part: "After having heard and received all of the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole."

[15]Theoretically, if a jury were to interpret the 1978 law to mean that aggravating factors "outweigh" mitigating factors only when it believes that death is the appropriate sentence, the 1978 and 1977 provisions would be essentially indistinguishable. But the 1978 law does not define "outweigh" in those terms, and the wording of the 1978 provision could reasonably suggest to a jury that its task is simply to measure aggravating factors against mitigating factors and to return a death sentence whenever aggravation is more "weighty" than mitigation. The Attorney General does not contend otherwise.

Indeed, amicus draws our attention to a recent capital trial in which the record demonstrates rather clearly that the jury interpreted the 1978 provision in just this manner. In People v. Neely (El Dorado Super. Ct. No. 40426), the jury sent the trial court a note during its deliberations asking if Neely could be sentenced to life imprisonment without the possibility of parole even if it found that aggravating factors outweighed mitigating factors: "May we show mercy and give life without possibility even though we feel aggravating outweighs mitigating?" In response, the trial court simply reread the instructions it had previously given and observed that the general instruction which allowed the jury to consider pity, sympathy or mercy at the penalty phase should not be interpreted as providing anything contrary to the instruction which provided that if aggravation outweighs mitigation the jury shall *impose* a sentence of death. Shortly thereafter, the jury returned a death sentence.

The Attorney General—who does not challenge the accuracy of the information furnished by amicus—objects to amicus' reference to the Neely proceedings on the ground that the matter is not contained in the appellate record in this case. Under sections 452 and 459 of the Evidence Code, however, this court may properly take judicial notice of records of any court in the state.

In analyzing the statutory argument, it appears plain at the outset that—as a matter of both "legislative intent" and ordinary principles of statutory interpretation—the trial court erred in instructing the jury pursuant to the 1978, rather than the 1977, provision. In the ballot argument accompanying the 1978 initiative, the proponents and principal drafters of the measure made it clear that they believed that the initiative would be purely prospective in effect[16] and both statutory and judicial authorities establish that, in the absence of a contrary declaration, penal legislation is not retroactive. (See § 3; *People* v. *Teron* (1979) 23 Cal.3d 103, 116-119 [151 Cal.Rptr. 633, 588 P.2d 773].)[17] Thus, even without considering potential ex post facto problems, we conclude that the court was mistaken in instructing under the 1978 provision.

The Attorney General does not contend that the 1978 provision was applicable here, but argues that the error did not prejudice Easley and may have even benefitted him. The argument relies on the fact that whereas under the 1977 law the jury could return a death penalty without regard to the relative weight of aggravating and mitigating circumstances, the 1978 law permits a death sentence *only* if the jury finds that aggravation outweighs mitigation.

Defendant responds, however, that an accused is nonetheless generally worse off under the 1978 law. He points out that while the 1977 law left the jury free to determine the proper interplay between aggravating and mitigating circumstances and to impose life imprisonment without possibility of parole whenever it believed that death was not called for, the 1978 provision *mandates* a death sentence whenever aggravating circumstances outweigh mitigating circumstances, even if the jury does not think that the net aggravation is sufficient to warrant death. To illustrate the detrimental effect of the 1978 formulation, defendant observes that in a case in which the prosecutor introduces no new evidence at the penalty phase—choosing to rely on the circumstances of the offense and the special circumstances that have been found to exist as aggravating circumstances—and the accused offers no evidence in mitigation, the 1978 provision would mandate a death sentence without regard to the relative egregiousness of the offense, because

---

[16]In answering a charge made by the opponents of the measure, the proponents of the proposition stated: "They say that Proposition 7 doesn't specify what happens to those who have been charged with murder under the old law. Any first-year law student could have told them Proposition 7 will not be applied retroactively. Anyone arrested under an *old* law will be tried and sentenced under the *old* law." (Original italics.) (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1978), rebuttal to argument against Prop. 7, p. 35.)

[17]The Attorney General does not suggest that the 1978 initiative, considered as a whole (see *In re Griffin* (1965) 63 Cal.2d 757, 758-760 [48 Cal.Rptr. 183, 408 P.2d 959]), was an "ameliorative" measure that might properly be applied retroactively under the reasoning of *In re Estrada* (1965) 63 Cal.2d 740, 746 [48 Cal.Rptr. 172, 408 P.2d 959]. (See *People* v. *Superior Court (Dillon)* (1981) 115 Cal.App.3d 687, 691-692 [185 Cal.Rptr. 290].)

there would be at least some evidence of aggravation and none of mitigation. Under the 1977 law, a jury would be free in these same circumstances to impose life imprisonment without possibility of parole if it believed that the offense itself did not warrant the death penalty.

Although the 1978 amendment of section 190.3 may in some cases conceivably aid a defendant in the one respect that the Attorney General has identified,[18] we have little doubt that, on balance, the 1978 version is much less favorable to a defendant than the 1977 provision. In determining prejudice in this case, however, we need not rely on an assessment of the relative "benefits" and "detriments" of the 1978 provision as to defendants in general, because we believe that, in any event, a new penalty trial is required here. Since it was instructed under the 1978 law, the jury in this case was told that if it found that aggravating factors outweighed mitigating factors, it *must* return a verdict of death. Given its verdict, of course, it is clear that the jury did in fact find that aggravation outweighed mitigation. If it had been properly instructed under the 1977 law, however, the jury would have understood that even if aggravation outweighed mitigation, it was *not required* to impose a death sentence but could exercise mercy and return a verdict of life without possibility of parole. Thus, the erroneous instruction deprived defendant of the opportunity to have the jury exercise the discretion that the 1977 statute provided when aggravation outweighs mitigation. Under these circumstances, we conclude that defendant is entitled to a retrial of the penalty phase before a jury that is properly instructed under the 1977 law and that understands that—even if aggravation outweighs mitigation—it may properly spare his life.[19]

## 2. *Nonviolent Prior as Aggravating Factor*

In addition to changing the standard governing the exercise of sentencing discretion, the 1978 initiative added a new factor to the list of aggravating

---

[18]The benefit provided by the requirement that the jury impose a sentence of life without possibility of parole whenever it finds that mitigation outweighs aggravation may well be more theoretical than real. It is difficult to believe that, under the discretion afforded by the 1977 provision, a jury that felt that mitigating circumstances outweighed aggravating circumstances would nonetheless have returned a death sentence.

[19]The dissenting opinion's contrary conclusion apparently stems—at least in part—from its failure to understand the crucial difference between the 1977 and 1978 statutes. Contrary to the dissent's suggestion (p. 889, *post*), our holding does not rest on a conclusion that the statutes differ because the 1977 law instructs the jury to "consider" the aggravating and mitigating factors, whereas the 1978 law instructs the jury to "weigh" the factors; in that respect, there may well be no significant difference between the two provisions. Instead, as we have explained, the significant disparity in treatment arises after the jury has undertaken the "considering" or "weighing": under the 1978 law, when the jury finds that aggravation outweighs mitigation it has no choice but to return a death sentence, while under the 1977 law it retains discretion to spare a defendant's life even if aggravation outweighs mitigation.

and mitigating circumstances which the jury is directed to "consider" and "be guided by" in deciding whether a defendant is to live or die. With respect to a defendant's prior criminal acts, the 1977 law limited the jury's consideration to "the presence or absence of criminal activity by the defendant *which involved the use or attempted use of force or violence* or the expressed or implied threat to use force or violence." (Italics added.) (Former § 190.3, subd. (b).) The 1978 law retained that factor (§ 190.3, subd. (b)), but added a new factor—"the presence or absence of *any* prior felony *conviction*" (italics added) (§ 190.3, subd. (c))—thus permitting a defendant's prior conviction of a *nonviolent* crime to be used as an additional aggravating factor.

 Because—as discussed above—the 1977, rather than the 1978, law applied in this case, the trial court clearly erred in instructing on this new aggravating factor. In asserting that he was prejudiced by this error, defendant points out that there was evidence that he had in fact suffered a prior conviction for a nonviolent felony—counterfeiting. Defendant maintains that by virtue of the erroneous instruction, one or more jurors may possibly have taken this conviction into consideration in finding that he had led a "life of crime" and thus deserved the death penalty.

 In response, the Attorney General first contends that because it was defendant himself who—during the testimony of his parole officer as a favorable defense witness—brought the counterfeiting prior to the jury's attention, he should not be able to complain about potential prejudice flowing from that conviction. While it is not clear that defendant was the first to broach the subject,[20] even if he was, he plainly did not "invite" the trial court's instruction which erroneously advised the jury that the prior conviction was a statutorily designated aggravating factor which should be considered in determining sentence. (See, e.g., *People* v. *Graham, supra,* 71 Cal.2d 303, 317-322.) Accordingly, he is entitled to object to the improper instruction here.

The Attorney General further argues that in light of the aggravated nature of the murders and the Nevada arson, the presence of the counterfeiting prior could not reasonably have affected defendant's sentence. While it does seem unlikely that the counterfeiting conviction played a major role in the jury's sentencing decision, the attempt to gauge prejudice at the penalty phase is always a hazardous task. In any event, we need not decide whether

---

[20]Before defendant's parole officer testified, the prosecution—in cross-examining defendant's mother—had brought out the fact that defendant had previously been in prison. In light of that revelation, the prosecution could reasonably have anticipated that defendant would attempt to mitigate the potential prejudice by disclosing the nonviolent nature of his prior conviction.

this error alone was sufficiently prejudicial to compel a new penalty trial, because the additional, more serious instructional errors noted above clearly do require a new penalty proceeding.

## IV. Conclusion

For the reasons discussed above, the judgment as to guilt is affirmed, the judgment as to penalty is reversed and the case is remanded for a new penalty trial before a properly instructed jury.

Bird, C. J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**MOSK, J.**—I concur in the judgment affirming as to guilt, and agree that the judgment must be reversed as to penalty because of the serious error of the trial court in instructing the jury under the 1978 death penalty law rather than the 1977 law.

However, I cannot join the majority in its criticism of the instruction barring the jury from being swayed by mere sympathy. On that issue I adhere to the views expressed in my dissenting opinion in *People v. Bandhauer* (1970) 1 Cal.3d 609, 619 [83 Cal.Rptr. 184, 463 P.2d 408]. In the current climate of public opinion, sympathy is more likely to be aroused for the victim and his family than for a defendant who has been found guilty of a brutal first degree murder. Thus cautioning a jury in the penalty phase of the trial not to be swayed by mere sympathy redounds to the benefit, not the detriment, of the defendant.

**RICHARDSON, J.**—I respectfully dissent.

The majority continues its trend, lamentable in my view, of reversing death penalty judgments for purported "errors" which reasonably could not have affected the jury's verdict. (See, e.g., *People v. Robertson* (1982) 33 Cal.3d 21, 63 [188 Cal.Rptr. 77, 655 P.2d 279] [dis opn]; *People v. Arcega* (1982) 32 Cal.3d 504, 531-534 [186 Cal.Rptr. 94, 651 P.2d 338] [dis. opn.]; *People v. Hogan* (1982) 31 Cal.3d 815, 864 [183 Cal.Rptr. 817, 647 P.2d 93] [dis. opn.]; *People v. Haskett* (1982) 30 Cal.3d 841, 868-869 [180 Cal.Rptr. 640, 640 P.2d 776] [dis. opn.]; *People v. Ramos* (1982) 30 Cal.3d 553, 605 [180 Cal.Rptr. 266, 639 P.2d 908] [dis. opn.], judgment vacated and cause remanded *sub nom. California v. Ramos* (1983) — U.S. — [77 L.Ed.2d 1171, 103 S.Ct. 3446]; *People v. Murtishaw* (1981) 29 Cal.3d 733, 780 [175 Cal.Rptr. 738, 631 P.2d 446] [dis. opn.]; *People v. Green* (1980) 27 Cal.3d 1, 77-78 [164 Cal.Rptr. 1, 609 P.2d 468] [dis. opn.]; *People v. Velasquez* (1980) 26 Cal.3d 425, 447 [162 Cal.Rptr. 306,

606 P.2d 341] [dis. opn.]; cf. *People* v. *Williams* (1981) 29 Cal.3d 392, 415-417 [174 Cal.Rptr. 317, 628 P.2d 869] [dis. opn.].)

Although California has had a valid constitutional death penalty law since 1977, and approximately 145 judgments of death have been filed with us since then, we have thus far decided fewer than 20 such appeals. Of those decided, we have reversed the penalty in 16 cases and have affirmed the judgment of death in only 2. (*People* v. *Harris* (1981) 28 Cal.3d 935 [171 Cal.Rptr. 679, 623 P.2d 240]; *People* v. *Jackson* (1980) 28 Cal.3d 264 [168 Cal.Rptr. 603, 618 P.2d 149].) The judgments in those two cases are presently subject to pending habeas corpus proceedings either in this court (*Jackson*) or in a federal court (*Harris*). As reflected in the majority's ruling in the present case, it is apparent that the majority is willing to reverse a judgment of death for the slightest procedural defect or omission.

Here, the majority reverses the death penalty verdict because of two claimed procedural "errors" which even defendant's own appellate counsel evidently deemed too insignificant to raise on appeal. As the majority acknowledges, these points were raised by an amicus curiae on rehearing following our original affirmance of the judgment of death.

### 1. *"Sympathy" Instruction*

The jury was instructed not to be influenced by "pity" for defendant or "mere sentiment, conjecture, sympathy, passion, prejudice . . . ." Can we reasonably conclude that this harmless admonition, buried in a mass of penalty phase instructions, induced the jury to vote the death penalty for the defendant, a convicted hired killer and arsonist? One thing is very clear—the instruction did not prevent defendant's introduction of, and the jury's consideration of, mitigating evidence regarding his background and character. Indeed, the jury was specifically instructed that it could consider "*any* other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." (Italics added, Pen. Code, § 190.3, subd. (k).) This is a very broad and sweeping instruction favorable to the defendant.

Nonetheless, the majority reasons that, solely because of the trial court's "sympathy" instruction, "the court in effect told the jury not to give any weight to the bulk of the evidence proffered by the defendant." (*Ante,* p. 879.) With due deference to my colleagues, I think such a suggestion is wholly unrealistic and mistakenly assumes that the jurors lacked ordinary intelligence and common sense. We can fairly assume that the jurors understood their proper function: to weigh all of the aggravating and mitigating circumstances in the case and reach their penalty decision accordingly.

This certainly was the assumption of counsel during the trial and the foregoing conclusion is reinforced by an examination of the closing arguments. The prosecutor told the jurors that "Another factor for you to consider is *the background of the defendants*." (Italics added.) In similar fashion, defense counsel likewise explained to the jurors that "one of the things that you can consider in mitigation in this case is evidence *of a defendant's background*." (Italics added.) Before the jury, defense counsel then reviewed at length the mitigating testimony regarding defendant's family life and his nonviolent history. Does the majority truly believe that the jurors ignored the "any other circumstance" instruction and the arguments of both counsel, and disregarded this mitigating testimony merely because they were instructed not to be influenced by such factors as "mere sentiment, conjecture, sympathy, passion, prejudice . . . ."?

Justice Mosk touched upon this precise point in his dissenting opinion in *People* v. *Bandhauer* (1970) 1 Cal.3d 609, 619-620 [83 Cal.Rptr. 184, 463 P.2d 408]), wherein he stated: "Realistically viewed, the instruction [quoted above] is, on balance, favorable to the defendant. Of the various influences proscribed, 'sentiment' is vague and 'conjecture' is neutral, but 'passion, prejudice, public opinion or public feeling' are most often hostile to the defendant. I doubt, for example, that the majority would sanction an instruction which affirmatively authorized the jury to be governed by such 'passion, prejudice, public opinion or public feeling.' This leaves 'sympathy' as the majority's main concern. But even that emotion, I submit is more likely to be evoked in favor of the innocent victim and his family than of the criminal whom the jury has convicted of the offense." (1 Cal.3d at p. 620.) Justice Mosk further observed that "the majority seize upon one word in one instruction to reverse as to penalty . . . . I am persuaded there is wholly inadequate justification under the 'miscarriage of justice' clause of the Constitution (Cal. Const., art. VI, § 13) to require yet another penalty trial." (1 Cal.3d at p. 621.)

With reference to the factor of "sympathy," we will do well to recall what this case is about. Defendant was convicted of executing a husband and wife. After binding their hands and legs with baling wire, he inserted rubber balls in their mouths to muffle their screams of pain. Then, as they lay bound and helpless, he methodically stabbed both of his victims over 110 times (according to the autopsy report) with an ice pick, the tip of which finally broke off in Mrs. Junghans' skull. For his actions he was paid $4,000 within hours after he had completed the two murders. Under such circumstances I find no reasonable basis for concluding, as do my colleagues, that the "sympathy" instruction prejudiced defendant or resulted in any "miscarriage of justice."

2. *Use of 1978 Death Penalty Law Guidelines*

The majority next holds that the trial court committed reversible error in inadvertently instructing the jury in the language of the 1978, rather than the 1977, death penalty law. In my view, any such error was patently harmless in this case.

Under the 1977 law, the jurors "shall consider, take into account and be guided by the aggravating and mitigating circumstances . . . and shall determine whether the penalty shall be death or life imprisonment without . . . parole." (Former Pen. Code, § 190.3.) The 1978 law, supposedly in contrast to the 1977 law, requires the jury to consider the various aggravating and mitigating factors and "impose a sentence of death if the . . . aggravating circumstances outweigh the mitigating circumstances." (Pen. Code, § 190.3.) Under the 1977 law, so the argument goes, the jury merely "considers" the mitigating and aggravating circumstances without actually *weighing* them as required by the 1978 law. Thus, it is contended, the trial court should not have used the 1978 law in framing the instructions, as the defendant is "generally worse off under the 1978 law." (*Ante,* p. 883.)

We rejected a similar argument in *People* v. *Frierson* (1979) 25 Cal.3d 142, 180 [158 Cal.Rptr. 281, 599 P.2d 587], wherein it was urged that the 1977 law was deficient in failing to require the jury to weigh the aggravating and mitigating factors in making its decision. We interpreted the language of the 1977 law "as *essentially equivalent* to the provision in the valid Florida statute requiring the sentencing authority to 'weigh' those factors in reaching its decision." (Italics added; accord *People* v. *Jackson, supra,* 28 Cal.3d 264, 315.) Thus, reasonably construed, both the 1977 and 1978 laws tell the penalty phase jurors the same thing: "Base your decision upon a weighing of the good with the bad." It is true that, unlike the 1978 law, the 1977 law does not *expressly* tell the jury that its death penalty decision depends on whether or not the "bad" factors outweigh the "good" ones, but that is the obvious and only reasonable implication of requiring the jurors to "consider, take into account and be guided by" all these factors.

The majority suggests that the 1978 law contains a mandatory aspect not present in the 1977 law, namely, a requirement that the jury impose the death penalty if it finds the aggravating circumstances outweigh the mitigating ones. Yet as we have seen, the 1977 law likewise requires such a weighing process. It is simply inconceivable to me that a different result would have obtained had the jury been instructed under the 1977 law.

Finally, the majority observes that under the 1977 law, defendant's prior *counterfeiting* felony would have been inadmissible as an aggravating fac-

tor. The majority speculates that some jurors might have relied upon this prior conviction in fixing the penalty at death. With due respect to my colleagues, I find it difficult to believe that on this record defendant, a convicted double murderer for hire and arsonist, was prejudiced by the jury hearing that he had admitted to a previous conviction of "counterfeiting." I think it reasonable to believe that the jury had its mind on other matters.

A personal aversion toward the death penalty is both understandable and widely shared, but the sovereign people have placed the law "on the books." It is our responsibility to enforce it in the absence of reversible error. We face an overwhelming and constantly increasing backlog of automatic appeals which only can be aggravated by needless reversals, retrials and renewed appeals. I am fully sensitive to the awesome implications of our resolution of the issues in a death penalty case, and the great care with which we must examine those issues. Nonetheless, our role is to review the claims of procedural error with an eye toward identifying and resolving only those which *reasonably* can be said to have affected the verdict adversely. We should not transform the slightest procedural irregularity into reversible error merely because the death penalty is invoked.

Our close scrutiny of the appellate record, properly heightened because of the irrevocable consequences of our judgment, however, goes no further than to determine whether "after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Even in death penalty cases we are under a constitutional mandate not to convert procedural fly specks into reversible errors. Bearing in mind that judges, lawyers and jurors are human, I think it fair to conclude that few, if any, trials, civil or criminal, contain records so immaculate or free of fault as to survive every arguable or imaginative claim of error. Just 10 years ago, the United States Supreme Court expressed a common sense principle which is equally binding upon us: " '[A] defendant is entitled to a fair trial but not a perfect one,' *for there are no perfect trials.* [Citations.]" (*Brown* v. *United States* (1973) 411 U.S. 223, 231 [36 L.Ed.2d 208, 215, 93 S.Ct. 1565], italics added.)

Believing as I do that the defendant received a "fair trial" at the penalty phase, I would affirm the judgment.