(Slip Opinion)  OCTOBER TERM, 2006  1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## AYERS, ACTING WARDEN *v.* BELMONTES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 05–493.   Argued October 3, 2006—Decided November 13, 2006

In the penalty phase of respondent's capital murder trial, he introduced mitigating evidence to show, *inter alia,* that he would lead a constructive life if incarcerated rather than executed, testifying that he had done so during a previous incarceration, when he had embraced Christianity.  Two prison chaplains and his Christian sponsors from that time testified on his behalf, and the parties' closing arguments discussed this mitigating evidence and how the jury should consider it.  The trial judge told the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime," an instruction known as "factor (k)" under California's then-applicable statutory scheme.  Respondent was sentenced to death.  He contended, on direct review and in federal habeas proceedings, that factor (k) and the trial court's other instructions barred the jury from considering his forward-looking mitigation evidence in violation of his Eighth Amendment right to present all mitigating evidence in capital sentencing proceedings.  The Federal District Court denied relief, but the Ninth Circuit reversed.  On reconsideration in light of *Brown* v. *Payton*, 544 U. S. 133, the Ninth Circuit again invalidated respondent's sentence.

*Held:* The factor (k) instruction is consistent with the constitutional right to present mitigating evidence in capital sentencing proceedings.  Pp. 4–16.

(a) This Court has previously found that factor (k) does not preclude consideration of constitutionally relevant evidence, such as mitigating evidence about a defendant's precrime background and character, *Boyde* v. *California*, 494 U. S. 370, 377–378, 386, or postcrime rehabilitation, *Brown* v. *Payton, supra*, at 135–136, and found the proper inquiry to be "whether there is a reasonable likelihood

that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence," *Boyde, supra,* at 380. Pp. 4–6.

(b) That inquiry applies here. Like *Payton,* this case involves forward-looking evidence and comes to the Court on federal habeas proceedings, but unlike *Payton,* it was filed before the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The Ninth Circuit distinguished *Payton* on this ground, but erred in finding a "reasonable probability" that the jury did not consider evidence of respondent's future potential. 414 F. 3d 1094, 1138. Pp. 6–16.

(1) The Circuit adopted a narrow and unrealistic interpretation of factor (k), ruling that "this instruction allows the jury to consider evidence that bears upon the commission of the crime by the defendant and excuses or mitigates his culpability for the offense," 414 F. 3d 1094, 1134. As *Boyde* and *Payton* explain, the jury is directed "to consider *any other circumstance* that might excuse the crime." *Boyde, supra,* at 382. Just as precrime background and character *(Boyde)* and postcrime rehabilitation *(Payton)* may "extenuat[e] the gravity of the crime," so may some likelihood of future good conduct count as a circumstance tending to make a defendant less deserving of the death penalty. The Ninth Circuit failed to heed the full import of *Payton*'s holding, which is significant even where AEDPA is inapplicable. Moreover, since respondent sought to extrapolate future behavior from precrime conduct, his mitigation theory was more analogous to the good-character evidence *Boyde* found to fall within factor (k)'s purview. Pp. 6–8.

(2) This Court's interpretation of factor (k) is the one most consistent with the evidence presented to the jury, the parties' closing arguments, and the trial court's other instructions. It is improbable that the jury believed that the parties were engaged in an exercise in futility when respondent presented extensive forward-looking evidence in open court. Both prosecution and defense arguments assumed the evidence was relevant. The prosecutor's remarks that the evidence was weak and his opinion about the weight it should be given confirmed to the jury that it should analyze respondent's future potential. Respondent's personal pleas were consistent with a trial in which the jury would assess his future prospects in determining what sentence to impose. This analysis is confirmed by defense counsel's closing arguments. The trial court's other instructions make it quite implausible that the jury would deem itself foreclosed from considering respondent's full case in mitigation. The judge told the jury to consider all of the evidence, which included respondent's forward-looking mitigation case. The sharp contrast between the aggravation

Syllabus

instruction (only enumerated factors could be considered) and the mitigation one (listed factors were merely examples) also made clear that the jury was to take a broad view of mitigating evidence. In concluding otherwise, the Ninth Circuit cited juror queries as evidence of confusion. Assuming that interpretation is correct, the court's conclusion that a juror likely ignored forward-looking evidence presupposes what it purports to establish, namely, that forward-looking evidence could not fall within factor (k). Pp. 8–16.

414 F. 3d 1094, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, and ALITO, JJ., joined. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 05–493

_____

## ROBERT L. AYERS, JR., ACTING WARDEN, PETITIONER *v.* FERNANDO BELMONTES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[November 13, 2006]

JUSTICE KENNEDY delivered the opinion of the Court.

Fernando Belmontes, the respondent here, was tried in 1982 in the Superior Court of the State of California in and for the County of San Joaquin. A jury returned a verdict of murder in the first degree and then determined he should be sentenced to death. The issue before us concerns a jury instruction in the sentencing phase.

The trial court, following the statute then in effect, directed the jury, with other instructions and in a context to be discussed in more detail, to consider certain specific factors either as aggravating or mitigating. The trial court further instructed the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." App. 184. Under the then-applicable statutory scheme this general or catchall factor was codified at Cal. Penal Code Ann. §190.3 (k) (West 1988); and it is referred to as "factor (k)."

Belmontes contended, on direct review, in state collateral proceedings, and in the federal habeas proceedings giving rise to this case, that factor (k) and the trial court's

other instructions barred the jury from considering his forward-looking mitigation evidence—specifically evidence that he likely would lead a constructive life if incarcerated instead of executed. The alleged limitation, in his view, prevented the jury from considering relevant mitigation evidence, in violation of his Eighth Amendment right to present all mitigating evidence in capital sentencing proceedings. See, *e.g., Penry* v. *Johnson,* 532 U. S. 782, 797 (2001); *Skipper* v. *South Carolina,* 476 U. S. 1, 4–5, 8 (1986); *Eddings* v. *Oklahoma,* 455 U. S. 104, 112 (1982). The California Supreme Court, affirming the judgment and sentence, rejected this contention and other challenges. *People* v. *Belmontes,* 45 Cal. 3d 744, 799–802, 819, 755 P. 2d 310, 341–343, 355 (1988).

In February 1994, after exhausting state remedies, respondent filed an amended federal habeas petition. The United States District Court for the Eastern District of California denied relief, App. to Pet. for Cert. 140a–141a, 145a, but a divided panel of the United States Court of Appeals for the Ninth Circuit reversed in relevant part, *Belmontes* v. *Woodford,* 350 F. 3d 861, 908 (2003). Over the dissent of eight judges, the Court of Appeals denied rehearing en banc. *Belmontes* v. *Woodford,* 359 F. 3d 1079 (2004). This Court granted certiorari, vacated the judgment, and remanded for further consideration in light of *Brown* v. *Payton,* 544 U. S. 133 (2005). *Brown* v. *Belmontes,* 544 U. S. 945 (2005). On remand, a divided panel again invalidated respondent's sentence; it distinguished *Payton* on the grounds that the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, though applicable in that case, does not apply here. *Belmontes* v. *Brown,* 414 F. 3d 1094, 1101–1102 (2005). Over yet another dissent, the Court of Appeals again denied rehearing en banc. *Belmontes* v. *Stokes,* 427 F. 3d 663 (2005). We granted certiorari, 547 U. S. ___ (2006), and now reverse.

I

The evidence at trial showed that in March 1981, while burglarizing a home where two accomplices had attended a party, respondent unexpectedly encountered 19-year-old Steacy McConnell. Respondent killed her by striking her head 15 to 20 times with a steel dumbbell bar. Respondent had armed himself with the dumbbell bar before entering the victim's home. See *Belmontes*, 45 Cal. 3d, at 760–764, 755 P. 2d, at 315–317.

In the sentencing phase of his trial Belmontes introduced mitigating evidence to show, *inter alia*, that he would make positive contributions to society in a structured prison environment. Respondent testified that, during a previous term under the California Youth Authority (CYA), he had behaved in a constructive way, working his way to the number two position on a fire crew in the CYA fire camp in which he was incarcerated. App. 44–45, 53. About that time he had embraced Christianity and entered into a Christian sponsorship program. He admitted that initially he participated in this program to spend time away from the camp. Later, after forming a good relationship with the married couple who were his Christian sponsors, he pursued a more religious life and was baptized. Although his religious commitment lapsed upon his release from the CYA, he testified that he would once again turn to religion whenever he could rededicate himself fully to it. *Id.*, at 46–48, 53–55. Finally, he answered in the affirmative when asked if he was "prepared to contribute in anyway [he] can to society if [he was] put in prison for the rest of [his] life." *Id.*, at 58.

Respondent's former CYA chaplain testified at the sentencing hearing that respondent's conversion appeared genuine. The chaplain, describing respondent as "salvageable," expressed hope that respondent would contribute to prison ministries if given a life sentence. *Id.*, at 79–83. An assistant chaplain similarly testified that, based

on past experience, respondent likely would be adept at counseling other prisoners to avoid the mistakes he had made when they leave prison. *Id.*, at 95–96. And respondent's Christian sponsors testified he was like a son to them and had been a positive influence on their own son. They also indicated he had participated in various activities at their church. *Id.*, at 99–103, 110–114.

After respondent presented his mitigating evidence, the parties made closing arguments discussing respondent's mitigating evidence and how the jury should consider it. Respondent was also allowed to provide his own statement. The trial judge included in his instructions the disputed factor (k) language, an instruction that has since been amended, see Cal. Jury Instr., Crim., No. 8.85(k) (2005).

## II

In two earlier cases this Court considered a constitutional challenge to the factor (k) instruction. See *Brown* v. *Payton, supra; Boyde* v. *California*, 494 U. S. 370 (1990). In *Boyde*, the Court rejected a claim that factor (k), with its focus on circumstances "'extenuat[ing] the gravity of the crime,'" precluded consideration of mitigating evidence unrelated to the crime, such as evidence of the defendant's background and character. *Id.,* at 377–378, 386. The "proper inquiry," the Court explained, "is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.*, at 380. Since the defendant in *Boyde* "had an opportunity through factor (k) to argue that his background and character 'extenuated' or 'excused' the seriousness of the crime," the Court saw "no reason to believe that reasonable jurors would resist the view, 'long held by society,' that in an appropriate case such evidence would counsel imposition of a sentence less than death." *Id.*, at 382 (citing *Penry* v. *Lynaugh,* 492 U. S. 302,

319 (1989)).  During the sentencing phase in *Boyde*, moreover, the defense had presented extensive evidence regarding background and character, so construing factor (k) to preclude consideration of that evidence would have required the jurors not only to believe that "the court's instructions transformed all of this 'favorable testimony into a virtual charade,'" 494 U. S., at 383 (quoting *California* v. *Brown,* 479 U. S. 538, 542 (1987)), but also to disregard another instruction requiring the jury to "'*consider all of the evidence which has been received during any part of the trial of this case,*'" 494 U. S., at 383.

In *Payton,* the Court again evaluated arguments that factor (k) barred consideration of constitutionally relevant evidence—this time, evidence relating to postcrime rehabilitation, rather than precrime background and character.  See 544 U. S., at 135–136.  *Payton* did not come to this Court, as had *Boyde*, on direct review, but rather by federal habeas petition subject to AEDPA.  Relief was available only if "the state court's adjudication of the claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'"  *Payton*, *supra*, at 141 (quoting 28 U. S. C. §2254(d)(1)).  Although the prosecutor in *Payton* had argued to the jury—incorrectly—that factor (k) did not permit consideration of postcrime rehabilitation evidence, this Court concluded that the California Supreme Court reasonably applied *Boyde* in finding no Eighth Amendment violation.  544 U. S., at 142, 146–147.  Accepting the prosecutor's reading would have required "the surprising conclusion that remorse could never serve to lessen or excuse a crime."  *Id.*, at 142.  Furthermore, countering any misimpression created by the prosecution's argument, the defense in *Payton* had presented extensive evidence and argument regarding a postcrime religious conversion and other good behavior.  The trial court had instructed the

jury to consider all evidence admitted "'during any part of the trial in this case, except as you may be hereafter instructed,'" and the prosecution itself "devoted substantial attention to discounting [the postcrime evidence's] importance as compared to the aggravating factors." *Id.*, at 145–146. Hence, the state court in *Payton* could reasonably have concluded that, as in *Boyde*, there was no reasonable likelihood that the jury understood the instruction to preclude consideration of the postcrime mitigation evidence it had heard. 544 U. S., at 147.

## III

As the Court directed in *Boyde*, we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." 494 U. S., at 380. Here, as in *Payton*, respondent argues that factor (k) prevented the jury from giving effect to his forward-looking evidence. And, as in *Payton*, respondent's case comes to this Court in federal habeas proceedings collaterally attacking the state court's ruling. Unlike in *Payton*, however, the federal petition in this case was filed before AEDPA's effective date. AEDPA and its deferential standards of review are thus inapplicable. See *Woodford* v. *Garceau,* 538 U. S. 202, 210 (2003). The Court of Appeals distinguished *Payton* on this ground. See 414 F. 3d, at 1101–1102. It was mistaken, however, to find a "reasonable probability" that the jury did not consider respondent's future potential. *Id.*, at 1138.

## A

The Court of Appeals erred by adopting a narrow and, we conclude, an unrealistic interpretation of factor (k). "Most naturally read," the Court of Appeals reasoned, "this instruction allows the jury to consider evidence that bears upon the commission of the crime by the defendant

and excuses or mitigates his culpability for the offense."
*Id.,* at 1134. As both *Boyde* and *Payton* explain, however,
this interpretation is too confined. "The instruction did
not . . . limit the jury's consideration to 'any other circum-
stance *of the crime* which extenuates the gravity of the
crime.' The jury was directed to consider *any other cir-
cumstance* that might excuse the crime." *Boyde*, *supra*, at
382; see also *Payton*, *supra*, at 141–142. And just as pre-
crime background and character *(Boyde)* and postcrime
rehabilitation *(Payton)* may "extenuat[e] the gravity of the
crime," so may some likelihood of future good conduct
count as a circumstance tending to make a defendant less
deserving of the death penalty. Cf. *Skipper*, 476 U. S., at
4–5 (explaining that while inferences regarding future
conduct do not "relate specifically to [a defendant's] culpa-
bility for the crime he committed," those inferences are
"'mitigating' in the sense that they might serve 'as a basis
for a sentence less than death'" (quoting *Lockett* v. *Ohio,*
438 U. S. 586, 604 (1978) (plurality opinion))).

The Court of Appeals failed to heed the full import of
*Payton*'s holding, a holding that has significance even
where AEDPA is inapplicable. *Payton* indicated that
reading factor (k) to preclude consideration of postcrime
evidence would require "the surprising conclusion that
remorse could never serve to lessen or excuse a crime."
544 U. S., at 142. So, too, would it be counterintuitive if a
defendant's capacity to redeem himself through good
works could not extenuate his offense and render him less
deserving of a death sentence.

In any event, since respondent sought to extrapolate
future behavior from precrime conduct, his mitigation
theory was more analogous to the good-character evidence
examined in *Boyde* and held to fall within factor (k)'s
purview. See 494 U. S., at 381 (describing the evidence at
issue as including evidence of the defendant's "strength of
character"). Both types of evidence suggest the crime

stemmed more from adverse circumstances than from an irredeemable character. See 414 F. 3d, at 1141–1142 (O'Scannlain, J., concurring in part and dissenting in part); cf. *Johnson* v. *Texas,* 509 U. S. 350, 369 (1993) (noting that the "forward-looking" future-dangerousness inquiry "is not independent of an assessment of personal culpability").

## B

Our interpretation of factor (k) is the one most consistent with the evidence presented to the jury, the parties' closing arguments, and the other instructions provided by the trial court. Each of these will be discussed in turn.

As the Court of Appeals recognized, future-conduct evidence was central to the mitigation case presented by the defense. See 414 F. 3d, at 1134. Indeed, although the defense also adduced evidence of a troubled upbringing, respondent testified that he could not use his difficult life "as a crutch to say I am in a situation right now, I'm here now because of that." App. 40. Given this assertion, and considering the extensive forward-looking evidence presented at sentencing—evidence including testimony from two prison chaplains, respondent's church sponsors, and respondent himself—the jurors could have disregarded respondent's future potential only if they drew the unlikely inference that "the court's instructions transformed all of this 'favorable testimony into a virtual charade,'" *Boyde, supra,* at 383 (quoting *Brown,* 479 U. S., at 542). It is improbable the jurors believed that the parties were engaging in an exercise in futility when respondent presented (and both counsel later discussed) his mitigating evidence in open court.

Arguments by the prosecution and the defense assumed the evidence was relevant. The prosecutor initially discussed the various factors that were to guide the jury. He referred to factor (k) as "a catchall." App. 153. He then

discussed respondent's religious experience in some detail.
With respect to whether this experience fit within factor
(k), he indicated: "I'm not sure it really fits in there. I'm
not sure it really fits in any of them. But I think it ap-
pears to be a proper subject of consideration." *Id.*, at 154.
These seemingly contradictory statements are explained
by the prosecutor's following comments.

The prosecutor suggested (quite understandably on the
record) that respondent's religious evidence was weak. He
stated: "You know, first of all, it's no secret that the evi-
dence upon which the defendant's religious experience
rests is somewhat shaky." *Ibid.* He also opined that the
experience had to be taken "with a grain of salt." *Id.*, at
155. The jury would have realized that, when the prosecu-
tor suggested respondent's religious experience did not fit
within factor (k), he was discussing the persuasiveness of
the evidence, not the jury's ability to consider it. After all,
he thought religion was "a proper subject of considera-
tion." *Id.*, at 154.

The prosecutor then discussed how the jury should
weigh respondent's "religious awakening":

> "I suppose you can say it would be appropriate be-
> cause—in this fashion: The defendant may be of value
> to the community later. You recall the people talking
> about how he would have the opportunity to work
> with other prisoners in prison. And I think that value
> to the community is something that you have to weigh
> in. There's something to that.
>
> "On the other hand, the fact that someone has relig-
> ion as opposed to someone doesn't should be no
> grounds for either giving or withholding life. I mean
> let's turn it around and look at the other side of the
> coin. Suppose someone said he didn't belong to a
> church and didn't talk to a minister. Would that man
> deserve to die merely because of that? So if he says he

has religion, does he deserve the other penalty, life? I don't think that that should be an influencing factor at all in that respect. I don't think the law contemplates that and I don't think it's right." *Id.*, at 155.

These remarks confirmed to the jury that it should analyze respondent's future potential, his future "value to the community." *Ibid.* This is what respondent himself wanted it to do. And while the prosecutor commented that the law did not contemplate jury consideration of respondent's religious conversion, respondent did not argue that the jury should consider the mere fact that he had discovered religion. Rather, as manifested by his arguments on appeal, respondent wanted to use this religious evidence to demonstrate his future "value to the community," not to illustrate his past religious awakening. Nothing the prosecutor said would have convinced the jury that it was forbidden from even considering respondent's religious conversion, though surely the jury could discount it; and nothing the prosecutor said would have led the jury to think it could not consider respondent's future potential, especially since he indicated that this is exactly what the jury had "to weigh" in its deliberation. *Ibid.*

After the prosecutor concluded his arguments, the trial judge allowed respondent to speak on his own behalf. Respondent, while not showing any remorse, suggested that life imprisonment offered "an opportunity to achieve goals and try to better yourself." *Id.*, at 163. He also stated: "I myself would really like to have my life and try to improve myself." *Id.*, at 164. Respondent's personal pleas were consistent with a trial in which the jury would assess his future prospects in determining what sentence to impose.

Defense counsel's closing arguments confirm this analysis. To be sure, commenting on the mitigating evidence, he initially indicated: "I'm not going to insult you by tell-

ing you I think [the mitigating evidence] excuses in any way what happened here. That is not the reason I asked these people to come in." *Id.*, at 166. Read in context defense counsel's remarks did not imply the jury should ignore the mitigating evidence. Rather, conforming to the dichotomy within factor (k) itself, his remarks merely distinguished between a legal excuse and an extenuating circumstance. Cf. Cal. Penal Code Ann. §190.3(k) ("[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime").

That defense counsel did, in fact, want the jury to take into account respondent's future potential became manifest near the end of his argument. He suggested that the "people who came in here [and] told you about [respondent]" provided the jury with "a game plan" for what respondent could do with his life. App. 170. He continued: "We're just suggesting the tip of the iceberg because who knows in 20, 30, 40, 50 years what sorts of things he can do, as he fits into the system, as he learns to set his goals, to contribute something in whatever way he can." *Ibid.* This would have left the jury believing it could and should contemplate respondent's potential.

Other instructions from the trial court make it quite implausible that the jury would deem itself foreclosed from considering respondent's full case in mitigation. Before enumerating specific factors for consideration— factors including the circumstances of the crime, the defendant's age, and "[t]he presence or absence of any prior felony conviction," *id.,* at 184, as well as the factor (k) catchall—the judge told the jury: "In determining which penalty is to be imposed on the defendant you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed." *Id.,* at 183. After listing the factors, he indicated:

"After having heard all of the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

"If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole." *Id.*, at 185.

The judge then gave a supplemental instruction regarding aggravating and mitigating factors:

"I have previously read to you the list of aggravating circumstances which the law permits you to consider if you find that any of them is established by the evidence. These are the only aggravating circumstances that you may consider. You are not allowed to take account of any other facts or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case.

"However, the mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose a death penalty or a death sentence upon Mr. Belmontes. You should pay careful attention to each of these factors. Any one of them standing alone may support a decision that death is not the appropriate punishment in this case." *Id.,* at 185–186.

Given the evidence and arguments presented to the jury, these instructions eliminate any reasonable likelihood that a juror would consider respondent's future

prospects to be beyond the bounds of proper consideration. The judge told the jury to consider "all of the evidence," and "all of the evidence" included respondent's forward-looking mitigation case. While the judge did end his broad command to appraise all the evidence with the qualifier "except as you may be hereafter instructed," *id.*, at 183, he did not later instruct the jury that it should disregard respondent's future potential in prison. The jury could not fairly read the limitation in the instruction to apply to respondent's central mitigation theory. By contrast, in response to a juror's question, the trial judge specifically instructed the jury not to consider whether respondent could receive psychiatric treatment while in prison.

The sharp contrast between the court's instruction on aggravation (that only enumerated factors could be considered) and its instruction on mitigation (that listed factors were "merely . . . examples," *id.,* at 186) made it clear that the jury was to take a broad view of mitigating evidence. Coming back to back, the instructions conveyed the message that the jury should weigh the finite aggravators against the potentially infinite mitigators. That the trial judge told the jury to "pay careful attention" to the listed mitigating factors, *ibid.,* moreover, did not compel the jury to give them sole consideration. For this to be the case, the jury would have had to fail to take the judge at his word. The judge did not advise the jury to pay exclusive attention to the listed mitigating circumstances, and he had told the jury that these circumstances were simply examples.

It is implausible that the jury supposed that past deeds pointing to a constructive future could not "extenuat[e] the gravity of the crime," as required by factor (k), much less that such evidence could not be considered at all. *Boyde* concludes that in jury deliberations "commonsense understanding of the instructions in the light of all that has taken place at the trial [is] likely to prevail over technical

hairsplitting." 494 U. S., at 381. Here, far from encourag-
ing the jury to ignore the defense's central evidence, the
instructions supported giving it due weight.

In concluding otherwise, the Court of Appeals cited
queries from some of the jurors as evidence of confusion.
Although the jury's initial question is not in the record, it
appeared to ask the judge about the consequences of fail-
ing to reach a unanimous verdict. Cf. 414 F. 3d, at 1135.
In response, the judge reread portions of the instructions
and stated that "all 12 jurors must agree, if you can." App.
190. Before the judge sent the jury back for further delib-
eration, the following exchange took place:

> "JUROR HERN: The statement about the aggrava-
> tion and mitigation of the circumstances, now, that
> was the listing?
>
> "THE COURT: That was the listing, yes, ma'am.
>
> "JUROR HERN: Of those certain factors we were to
> decide one or the other and then balance the sheet?
>
> "THE COURT: That is right. It is a balancing proc-
> ess. Mr. Meyer?
>
> "JUROR MEYER: A specific question, would this be
> an either/or situation, not a one, if you cannot the
> other?
>
> "THE COURT: No. It is not that.
>
> "JUROR MEYER: It is an either/or situation?
>
> "THE COURT: Exactly. If you can make that ei-
> ther/or decision. If you cannot, then I will discharge
> you.
>
> "JUROR HAILSTONE: Could I ask a question? I
> don't know if it is permissible. Is it possible that he
> could have psychiatric treatment during this time?
>
> "THE COURT: That is something you cannot con-
> sider in making your decision." *Id.*, at 191.

The Court of Appeals decided Juror Hern's questions

indicated she thought (incorrectly) that only listed mitigating factors were on the table—an error, in the Court of Appeals' view, that should have prompted a clarifying instruction confirming that all the mitigating evidence was relevant. 414 F. 3d, at 1136. The Court of Appeals further supposed the response to Juror Hailstone's question compounded the problem, since psychiatric treatment presumably would be necessary only in aid of future rehabilitation. *Id.*, at 1137.

The Court of Appeals' analysis is flawed. To begin with, attributing to Juror Hern a dilemma over the scope of mitigation is only one way to interpret her questions, and, as the California Supreme Court observed on direct review, it is not necessarily the correct one, see *Belmontes*, 45 Cal. 3d, at 804, 755 P. 2d, at 344. It is at least as likely that the juror was simply asking for clarification about California's overall balancing process, which requires juries to consider and balance enumerated factors (such as age and criminal history) that are labeled neither as mitigating nor as aggravating. As Juror Hern surmised (but sought to clarify), the jury itself must determine the side of the balance on which each listed factor falls. See Cal. Penal Code Ann. §190.3 (providing that, "[i]n determining the penalty, the trier of fact shall take into account" any relevant listed factors); see generally *Tuilaepa* v. *California,* 512 U. S. 967, 978–979 (1994) (noting that the §190.3 sentencing factors "do not instruct the sentencer how to weigh any of the facts it finds in deciding upon the ultimate sentence").

Even assuming the Court of Appeals correctly interpreted Juror Hern's questions, the court's conclusion that this juror likely ignored forward-looking evidence presupposes what it purports to establish, namely, that forward-looking evidence could not fall within factor (k). As discussed earlier, nothing barred the jury from viewing respondent's future prospects as "extenuat[ing] the gravity

of the crime," so nothing barred it from considering such evidence under the rubric of the "listing." As for Juror Hailstone's psychiatric-care question, this inquiry shows that, if anything, the jurors were considering respondent's potential. The trial court's response, far from implying a broad prohibition on forward-looking inferences, was readily explicable by the absence of any evidence in the record regarding psychiatric care.

In view of our analysis and disposition in this case it is unnecessary to address an argument for reversing the Court of Appeals based on the Court's holding in *Johnson* v. *Texas*, 509 U. S. 350 (1993), a subject raised by Judge O'Scannlain in his separate opinion in the Court of Appeals. See 414 F. 3d, at 1141–42 (opinion concurring in part and dissenting in part).

## IV

In this case, as in *Boyde* and as in *Payton*, the jury heard mitigating evidence, the trial court directed the jury to consider all the evidence presented, and the parties addressed the mitigating evidence in their closing arguments. This Court's cases establish, as a general rule, that a jury in such circumstances is not reasonably likely to believe itself barred from considering the defense's evidence as a factor "extenuat[ing] the gravity of the crime." The factor (k) instruction is consistent with the constitutional right to present mitigating evidence in capital sentencing proceedings.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 05–493

ROBERT L. AYERS, JR., ACTING WARDEN, PETI-
TIONER *v.* FERNANDO BELMONTES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[November 13, 2006]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

I adhere to my view that limiting a jury's discretion to consider all mitigating evidence does not violate the Eighth Amendment. See *Walton* v. *Arizona*, 497 U. S. 639, 673 (1990) (SCALIA, J., concurring in part and concurring in judgment). Even accepting the Court's jurisprudence to the contrary, however, this is arguably an easy case, given our reiteration in *Johnson* v. *Texas*, 509 U. S. 350, 372 (1993), that a jury need only "be able to consider in some manner all of a defendant's relevant mitigating evidence," and need not "be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant." But since petitioner has not relied on *Johnson*, as Judge O'Scannlain did below, see *Belmontes* v. *Brown*, 414 F. 3d 1094, 1141–1142 (CA9 2005) (opinion concurring in part and dissenting in part), I am content to join in full the Court's opinion, which correctly applies *Boyde* v. *California*, 494 U. S. 370 (1990).

# SUPREME COURT OF THE UNITED STATES

———————

No. 05–493

———————

## ROBERT L. AYERS, JR., ACTING WARDEN, PETITIONER *v.* FERNANDO BELMONTES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[November 13, 2006]

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

In *Lockett* v. *Ohio*, 438 U. S. 586 (1978), the Court set aside Ohio's death penalty statute as unconstitutional because it unduly restricted the mitigating evidence that a jury could consider in deciding whether to impose the death penalty. In his opinion announcing the judgment, Chief Justice Burger wrote:

> "There is no perfect procedure for deciding in which cases governmental authority should be used to impose death. But a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Id.*, at 605 (plurality opinion).

The respondent here, Fernando Belmontes, was sentenced to death in 1982, a scant four years after *Lockett*. See *People* v. *Belmontes*, 45 Cal. 3d 744, 755 P. 2d 310 (1988). Yet at the time of his sentencing, there remained

significant residual confusion as to whether the Constitu-
tion obligated States to permit juries to consider evidence
that, while not extenuating the defendant's culpability for
the crime, might nevertheless call for a sentence less than
death. Cf. *People* v. *Easley*, 34 Cal. 3d 858, 875–880, 671
P. 2d 813, 823–827 (1983) (noting arguments on both
sides).

The California death penalty statute in effect in 1982
quite plainly rested on the assumption that California
could preclude the consideration of such evidence. The
statute commanded that the jury "shall impose" a death
sentence if aggravating circumstances outweigh mitigat-
ing circumstances, and limited the jury's inquiry to 11
discrete categories of evidence. See Cal. Penal Code
§190.3 (West 1988). Other than factors relating to the
defendant's age and prior criminal record, every one of
those categories relate to the severity of the crime of which
the defendant was convicted.[1] And while the eleventh

───────────

[1] Those categories are: "(a) The circumstances of the crime of which
the defendant was convicted in the present proceeding and the exis-
tence of any special circumstances found to be true . . . .

"(b) The presence or absence of criminal activity by the defendant
which involved the use or attempted use of force or violence or the
express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant
was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's
homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances
which the defendant reasonably believed to be a moral justification or
extenuation for his conduct.

"(g) Whether or not defendant acted under extreme duress or under
the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the
defendant to appreciate the criminality of his conduct or to conform his
conduct to the requirements of law was impaired as a result of mental
disease or defect, or the affects of intoxication.

"(i) The age of the defendant at the time of the crime.

catch-all "factor (k)" authorized consideration of "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime," §190.3(k), factor (k)'s restrictive language sent the unmistakable message that California juries could properly give no mitigating weight to evidence that did not extenuate the severity of the crime.

Just a year after respondent's sentencing the California Supreme Court evinced considerable discomfort with factor (k). In *People* v. *Easley*, after discussing the possible unconstitutionality of the penalty phase instructions, the court inserted a critical footnote effectively amending factor (k) and expanding the evidence that a California jury could properly consider in deciding whether to impose a death sentence:

> "In order to avoid potential misunderstanding in the future, trial courts—in instructing on [factor (k)]—should inform the jury that it may consider as a mitigating factor 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and *any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'"* 34 Cal. 3d, at 878, n. 10, 671 P. 2d, at 826, n.

———————

  "(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

  "(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Cal. Penal Code Ann. §190.3 (West 1988).

  The 1988 version of §190.3 also provided that "[a]fter having heard and received all of the evidence, . . . the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section," and "shall determine whether the penalty shall be death or confinement in state prison for a term of life without the possibility of parole."

10 (emphasis added).[2]

Although *Easley* came too late to help respondent, the
California Supreme Court's evident concern that capital
juries must be permitted to consider evidence beyond that
which "extenuates the gravity of the crime" proved pre-
scient. In *Skipper* v. *South Carolina,* 476 U. S. 1 (1986)—
decided two years before the California Supreme Court
affirmed respondent's conviction and therefore fully appli-
cable here, see *Griffith* v. *Kentucky*, 479 U. S. 314, 322–
323 (1987)—we expressly rejected the argument, pre-
sented in Justice Powell's separate opinion, that the
States retained the authority to determine what mitigat-
ing evidence is relevant "as long as they do not foreclose
consideration of factors that may tend to reduce the de-
fendant's culpability for his crime," see *Skipper*, 476 U. S.,
at 11 (opinion concurring in judgment). Apart from the
traditional sentencing factors such as "[e]vidence concern-
ing the degree of the defendant's participation in the
crime, or his age and emotional history," Justice Powell
would have held that States could properly exclude evi-
dence during a capital sentencing proceeding. *Id.*, at 13.
The majority, however, took a more expansive view.
Although it recognized that the probative force of Skip-
per's excluded evidence "would not relate specifically to
petitioner's culpability *for the crime he committed*, [there
was] no question but that such inferences would be 'miti-
gating' in the sense that they might serve 'as a basis for a
sentence less than death.'" *Id.*, at 4–5 (quoting *Lockett*,

---

[2] The California Legislature also responded to the confusion by
amending factor (k) to include "any sympathetic or other aspect of the
defendant's character or record that the defendant offers as a basis for
a sentence less than death, whether or not related to the offense for
which he is on trial." Cal. Jury Instr., Crim., No. 8.85(k) (2005) (brack-
ets omitted). That amendment confirms the view that the category of
evidence that may provide the basis for a sentence other than death is
much broader that the category described in factor (k).

438 U. S., at 604; emphasis added). After *Skipper*, then, the law was clear: A capital jury must be allowed to consider a broader category of mitigating evidence than normally relevant in noncapital proceedings.

Respondent was sentenced, however, before *Easley* rewrote factor (k) and before *Skipper* resolved the confusion over whether States had the constitutional latitude to restrict evidence that did not "tend to reduce the defendant's culpability for his crime," 476 U. S., at 11 (Powell, J., concurring in judgment). As the following review of the record will underscore, that confusion pervaded every aspect of respondent's sentencing hearing. It addled the trial judge, the prosecutor, defense counsel, and— inevitably—the jurors themselves.

## I

At the sentencing hearing, after the prosecution put on its case—which consisted mainly of evidence of respondent's previous conduct, see *Belmontes*, 45 Cal. 3d, at 795, 755 P. 2d, at 338–339—respondent countered with testimony from his grandfather and his mother. That testimony focused almost entirely on respondent's background: His father drank to excess and savagely beat his wife; his parents were divorced when he was 9 or 10 years old; his mother remarried, but again divorced when respondent was 14 or 15 years old; at this point respondent became difficult to control, and, in 1979, he was sent to the California Youth Authority (Youth Authority); after his release, respondent did not live with his mother, although he kept in touch with her by telephone and was very close with his 15-year-old sister. See generally App. 5–22.

Next, the jury heard testimony from Robert Martinez and his wife Darlene, both of whom testified that they were close friends with respondent but admitted that they had seen him only once after he was released from the Youth Authority. *Id.,* at 26–27, 35. Robert further testi-

fied that respondent was the best man at his wedding and
that, prior to his wedding, the two of them would spend a
lot of time together, working on Martinez's car, drinking
beer, and smoking marijuana. *Id.,* at 25, 28. The focus of
Darlene's testimony was that she was a born-again Chris-
tian, and that, when respondent visited Darlene and her
husband after his release from the Youth Authority, he
told her that he was also a born-again Christian. *Id.,* at
35–36.

Respondent then testified on his own behalf. When
asked about his childhood, respondent answered that he
"can't use it as a crutch to say I am in a situation right
now, I'm here now because of that." *Id.,* at 40. He went on
to describe his relationships with his father and grandfa-
ther and to relate his experience at the Youth Authority.
*Id.,* at 41–45. Respondent testified that, while at the
Youth Authority, he became involved in a Christian pro-
gram and developed a relationship with his sponsors in
that program, Beverly and Fred Haro. *Id.,* at 46–48.
Upon his release, however, respondent started having
problems and abandoned his religious commitment, some-
thing he had not yet regained fully at the time of the
sentencing hearing. *Id.,* at 53–54. Respondent then de-
scribed his life in prison and stated that, were he given a
life sentence, he would attempt to make a positive contri-
bution to society. *Id.,* at 55–58. On cross-examination,
most of the prosecutor's questions focused on the sincerity
of respondent's religious commitment. *Id.,* at 58–65.

The following day, respondent presented testimony from
Reverend Dale Barrett and Don Miller, both ministers
who worked at the Youth Authority location where re-
spondent was held. Reverend Barrett described the Youth
Authority's M–2 program through which respondent was
matched with the Haros. *Id.,* at 74–76. He then testified
about respondent's involvement with the church and the
M–2 program, and how his interactions with respondent

led him to believe that he was "salvageable." *Id.,* at 76–82. Miller similarly testified about respondent's participation in the program and his belief that respondent would be adept at speaking with other prisoners about accepting religion. *Id.*, at 92, 95–96; see also *id.,* at 96 (testifying that respondent would "[d]efinitely . . . be used in the prison system for this sort of activity").

Finally, the jury heard testimony from respondent's sponsors in the M–2 program, Fred and Beverly Haro. The Haros described meeting respondent and their experiences with him. See generally *id.,* at 99–104; 110–112. They also testified about how close they had grown to respondent and about respondent's embrace of religion. *Id.,* at 101–102; 112–113.

Taken as a whole, the sentencing testimony supports three conclusions: first, excepting questions concerning the sincerity of respondent's religious convictions, there was no significant dispute about the credibility of the witnesses; second, little if any of the testimony extenuated the severity of respondent's crime; and third, the testimony afforded the jury a principled basis for imposing a sentence other than death.

## II

The prosecutor began his closing argument at the penalty phase by describing "th[e] listing of aggravating and mitigating circumstances" and instructing the jury that it must "weigh one against the other." App. 148. While he observed that "there is a proper place for sympathy and passion," *ibid.*, the prosecutor emphasized that the jury could only consider "the kind of sympathy the instruction tells you to consider [*i.e.*, sympathy that] naturally arises or properly arises *from the factors in aggravation and mitigation*." *Id.,* at 149 (emphasis added). He repeated to the jury that its duty was to "simpl[y] weig[h]" certain factors that the judge "will tell you that you may take into

account," *id.,* at 150–151, and he went through those listed factors one by one, carefully discussing the evidence that supported each factor, *id.,* at 151–157.

When the prosecutor turned to factor (k), he directly addressed the theory "that the defendant's religious experience is within that catchall that relates to the defendant at the time he committed the crime, extenuates the gravity of the crime." *Id.,* at 154. The prosecutor expressed doubt that the jury could consider the evidence at all, stating "I'm not sure it really fits in there. I'm not sure it really fits in any of them. But I think it appears to be a proper subject of consideration." *Ibid.* And again, after discussing the evidence supporting respondent's religious experience, the prosecutor questioned: "[I]s a religious awakening a basis for determining penalty? That's really the issue, how much does that weigh, or does it weigh on one side or the other." *Id.,* at 155. Ultimately, the prosecutor concluded: "I suppose you can say it would be appropriate because—in this fashion: The defendant may be of value to the community later. . . . And I think that value to the community is something that you have to weigh in. There's something to that." *Ibid.* But immediately thereafter, the prosecutor told the jury:

> "On the other hand, the fact that someone has religion as opposed to someone doesn't should be no grounds for either giving or withholding life. . . . So if he says he has religion, does he deserve the other penalty, life? I don't think that that should be an influencing factor at all in that respect. *I don't think the law contemplates that and I don't think it's right.*" *Ibid.* (emphasis added).

In conclusion, the prosecutor described the circumstances of the crime and asserted that "[a] dreadful crime requires a dreadful penalty . . . ." *Id.,* at 160.

Following the prosecutor's closing argument, the trial

judge allowed respondent to address the jury directly. Respondent again stated that he could not use his childhood as a crutch to explain his mistakes, and he said that his Christianity, too, could not be used as a crutch. *Id.,* at 162. Respondent then asked to keep his life, explaining that he understood that he had to pay for the victim's death, but that he wanted the opportunity to try to improve himself in the future. *Id.,* at 163.

Respondent's attorney, John Schick, then addressed the jury. He made no effort to persuade the jurors that the mitigating evidence somehow extenuated the severity of the crime. On the contrary, he said "I'm not going to insult you by telling you I think [the mitigating evidence] excuses in any way what happened here. That is not the reason I asked these people to come in." *Id.,* at 166. Instead, he argued that respondent might be able to make a positive contribution in a prison environment. He spoke about the way that respondent improved after he met Beverly and Fred Haro and about the way that respondent's religion shaped him, observing that religion plays a "very, very vital function . . . in anybody's life." *Ibid.* But Schick took care to emphasize that religion "does not excuse" the murder; rather, the point of that mitigating evidence was to let the jury "know something about the man." *Id.,* at 167, 166. He admitted that respondent "cannot make it on the outside," *id.,* at 167, recognized that respondent needed to be punished, and asked that the jury impose life in prison, a punishment "that has meaning, that has teeth in it . . . ." *Id.,* at 169. Critically, Schick contended that life in prison was an appropriate sentence because respondent could, if given the chance, "contribute something in whatever way he can." *Id.,* at 170.

In sum, both counsel agreed that *none* of the mitigating evidence could detract from the gravity of the crime, and defense counsel even insisted that it would "insult" the

jury to suggest that the mitigating evidence "excuses in any way what happened." *Id.,* at 166.

## III

At a conference on jury instructions with the two counsel, the trial judge plainly indicated that he believed that factor (k) circumscribed the mitigating evidence the jury could consider. The judge lifted the principal jury instructions verbatim from 7 of the 11 traditional sentencing factors set forth in the statute, App. 184, but he refused defense counsel's request to give the jury a separate list of potential mitigating factors, *id.,* at 142. Among those requested were two that specifically instructed the jury to consider respondent's ability to perform constructive work in prison and to live in confinement without acts of violence. See Brief for Respondent 5, n. 1. Those instructions would have been entirely proper—indeed, probably mandated—under our holding in *Skipper*. But the prosecutor, not having the benefit of *Skipper*, argued to the judge that "none [of the proposed mitigating instructions] here . . . relates to circumstances concerning the crime. I can't conceal the fact that I think that is the determinative factor in this case." App. 142. Agreeing, the judge refused to include the mitigating instructions, making the astonishing statement that the instructions already "seem to be a little over-laden with the factors in mitigation rather than in aggravation." *Ibid.*

Of particular importance, the judge modified defense counsel's request that the jury be told that the instructions did not contain an exhaustive list of mitigating factors. *Id.,* at 141. While he did give such an instruction, *ante*, at 12, he refused to include the following requested reference to nonstatutory factors: "'You may also consider any other circumstances [relating to the case or the defendant, Mr. Belmontes,] as reasons for not imposing the death sentence.'" Brief for Respondent 25–26; contra App.

186. The judge thus expressly *declined* to invite the jury to weigh "potentially infinite mitigators," contrary to the Court's assumption today, see *ante*, at 13. A more accurate summary of his rulings is that the jury could weigh nonstatutory circumstances—but only if they extenuated the severity of respondent's offense.

## IV

The next morning, the trial judge gave the jurors their instructions. He opened with the unyielding admonition that "[y]ou must accept and follow the rules of law as I state them to you," App. 175, and explained that he was required to read the instructions aloud even though they would have a written copy available during their deliberations, *ibid.*

After reading a set of boilerplate instructions, *id.,* at 176–183, the judge turned to the subject of "determining which penalty is to be imposed on the defendant," *id.,* at 183. He told the jury to "consider all of the evidence . . . *except as you may be hereafter instructed,*" *ibid.* (emphasis added), and then stated: "You shall consider, take into account and be guided by the following factors, if applicable." *Id.,* at 183–184. He then proceeded to repeat verbatim 7 of the 11 factors set forth in the statute. *Id.,* at 184. Except for the reference to the "age of the defendant at the time of the crime," *ibid.*, every one of those factors related to the severity of the crime itself. See n. 1, *supra*. The last of them, the factor (k) instruction, focused the jury's attention on any circumstance that "extenuates the gravity of the crime even though it is not a legal excuse for the crime." *Ibid.* No factor permitted the jury to consider "any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'" *Easley*, 34 Cal. 3d, at 878, n. 10, 671 P. 2d, at 826, n. 10 (citing *Lockett*, 438 U. S., at 604).

Emphasizing the importance of the listing of aggravat-

ing and mitigating circumstances, the judge next instructed the jury that it "shall consider, take into account and be guided *by the applicable factors* of aggravating and mitigating circumstances *upon which you have been instructed*." App. 185 (emphasis added). In other words, in reaching its decision, the jury was to consider each of the "applicable factors"—here, the seven factors the judge just finished reading—and no others.

As the Court points out, *ante*, at 13, the judge did tell the jury that "the mitigating circumstances which I have read for your consideration are given to you merely as examples of some of the factors that you may take into account as reasons for deciding not to impose . . . a death sentence . . . ." App. 186. But immediately afterwards, he instructed the jury to "pay careful attention to each of *these factors*. Any one of them standing alone may support a decision that death is not the appropriate punishment in this case." *Ibid.* (emphasis added). Since none of "these factors" (save for the age of the defendant) encompassed any mitigating circumstance unrelated to the severity of the crime, the most natural reading of the instruction is that any mitigating factor *that lessens the severity of the offense* may support a sentence other than death. On this view, any other mitigating circumstance is simply irrelevant to (in the prosecutor's words) the "simple weighing" the jury was tasked with performing. *Id.,* at 150.

## V

Questions asked by at least six different jurors during almost two full days of deliberation gave the judge an ample opportunity to clarify that the testimony offered on behalf of respondent, if credited by the jury, provided a permissible basis for imposing a sentence other than death. Far from eliminating their obvious confusion, his responses cemented the impression that the jurors' lone duty was to weigh specified, limited statutory factors

against each other.

After a lunch break, the judge reconvened the jury to answer a question that does not appear in the record; in response, the judge merely reread instructions telling the jury that it "must agree, if [it] can" and that it "shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances *upon which you have been instructed.*" App. 185, 188–189 (emphasis added). Because all of those factors were traditional sentencing factors, and because none of them permitted consideration of *Skipper*-type mitigating evidence, the judge's response was the functional equivalent of yet another admonition to disregard most of respondent's evidence.

After a colloquy between the judge and four different jurors (Hailstone, Wilson, Norton, and Huckabay) about the likelihood of reaching a unanimous verdict,[3] other jurors asked the judge a series of questions reflecting a concern about whether it was proper to consider aggravating or mitigating circumstances other than those specifi-

---

[3] "JUROR HAILSTONE: If we can't, Judge, what happens?

"THE COURT: I can't tell you that.

"JUROR WILSON: That is what we wanted to know.

"THE COURT: Okay. I know what will happen, but I can't tell you what will happen.

"MR. SCHICK: Maybe we should inquire whether the jury could reach a verdict.

"THE COURT: Do you think, Mr. Norton, you will be able to make a decision in this matter?

"JUROR HAILSTONE: Not the way it is going.

"JUROR NORTON: That is tough, yes.

"THE COURT: Do you think if I allow you to continue to discuss the matter and for you to go over the instructions again with one another, that the possibility of making a decision is there?

"JUROR NORTON: I believe there is a possibility.

"JUROR HUCKABAY: We did need more time.

"THE COURT: I think so. I think you need more time." App. 190–191.

cally listed in his instructions:

> "JUROR HERN:  The statement about the aggrava-
> tion and mitigation of the circumstances, now, that
> was the listing?
> "THE COURT:  That was the listing, yes, ma'am.
> "JUROR HERN:  Of those certain factors we were to
> decide one or the other and then balance the sheet?
> "THE COURT:  That is right.  It is a balancing proc-
> ess.  Mr. Meyer?
> "JUROR MEYER:  A specific question, would this be
> an either/or situation, not a one, if you cannot the
> other?
> "THE COURT:  No. It is not that.
> "JUROR MEYER:  It is an either/or situation?
> "THE COURT:  Exactly. If you can make that ei-
> ther/or decision.  If you cannot, then I will discharge
> you.
> "JUROR HAILSTONE:  Could I ask a question?  I
> don't know if it is permissible.  Is it possible that he
> could have psychiatric treatment during this time?
> "THE COURT: That is something you cannot consider
> in making your decision." App. 191.

The judge's responses strongly suggest that the "list-
ing"—the listed statutory factors—was all that the jury
could properly consider when "balanc[ing] the sheet."  See
n. 1, *supra*.  But it is difficult, if not impossible, to see how
evidence relating to future conduct even arguably "ex-
tenuate[d] the gravity of the crime"[4] under factor (k), and

---

[4] *Skipper* v. *South Carolina*, 476 U. S. 1, 4 (1986) (plurality opinion),
recognized that a defendant's potential good behavior in the future
would not relate to his "culpability for the crime he committed."  Even the
concurrence agreed: "Almost by definition," it reasoned, a prisoner's
good behavior "neither excuses the defendant's crime nor reduces his
responsibility for its commission."  *Id.,* at 12 (Powell, J., concurring in
judgment).

none of those listed factors gave the jury the chance to consider whether the respondent might redeem himself in prison. Cf. *Brown* v. *Payton*, 544 U. S. 133, 157 (2005) (SOUTER, J., dissenting) ("[I]t would be more than a stretch to say that the seriousness of the crime itself is affected by a defendant's subsequent experience"). And rather than inviting an open-ended review of mitigating factors that would include consideration of the defendant's possible future behavior in prison, the judge's answers emphasized the constraints on the "either/or" decision the jurors had to make.[5]

The arguments of counsel, the actual instructions to the jury, and this colloquy all support the conclusion that the jurors understood their task was to run through the listed statutory factors and weigh them against each other to determine whether respondent should be sentenced to death. Very little of respondent's evidence, however, even arguably "extenuate[d] the gravity of the crime." In my judgment, it is for that reason much more likely than not that the jury believed that the law forbade it from giving that evidence any weight at all. The Court of Appeals therefore correctly set aside respondent's death sentence. See *Boyde* v. *California*, 494 U. S. 370, 380 (1990) (plurality opinion) (requiring that a defendant show only that "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence").

―――――――――

[5] When Juror Hailstone asked the judge about a particular piece of forward-looking evidence—the possibility that respondent would get psychiatric treatment in prison—the judge told the jury that it could not consider that evidence in making its decision. The judge's answer, while legally correct, lent further support to the conclusion that respondent's future conduct in a structured prison environment was not relevant because it did not fall within any of the listed factors.

## VI

Nothing in the Court's opinion in *Boyde* upsets my view that respondent's death sentence cannot stand. Over the dissent of four Justices, the Court in *Boyde* both adopted a new "legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence," 494 U. S., at 378, and approved a blatantly atextual interpretation of the unadorned factor (k) instruction, *id.*, at 382, and n. 5. Applying its new standard and its dubious reading of factor (k), the Court held that there was "not a reasonable likelihood that Boyde's jurors interpreted the trial court's instructions to prevent consideration of mitigating evidence of background and character." *Id.*, at 381.

The Court rejected Boyde's argument that factor (k) made it impossible for the jury to consider testimony that Boyde had won a prize for dance choreography while in prison, which Boyde argued was *Skipper*-type evidence relating to whether "he could lead a useful life behind bars," 494 U. S., at 382, n. 5. But the Court did not hold or suggest that factor (k) allowed for the consideration of *Skipper*-type evidence. Instead, the Court found that the evidence of his dance choreography talents was presented as part of his "overall strategy to portray himself *as less culpable* than other defendants due to his disadvantaged background and his character strengths," *ibid.* (emphasis added), and therefore fell within the ambit of factor (k). Thus, although the *Boyde* opinion does not state so explicitly, it assumes that the factor (k) instruction would not permit the jury to consider *Skipper*-type "evidence of postcrime good prison behavior to show that [a defendant] would not pose a danger to the prison community if sentenced to life imprisonment rather than death." *Ibid.*; see also *Skipper*, 476 U. S., at 4 (recognizing that inferences regarding a defendant's "probable future conduct if sentenced to life in prison . . . would not relate specifically to

[the defendant's] culpability for the crime he committed"); *Payton*, 544 U. S., at 164 (SOUTER, J., dissenting) ("*Boyde* did not purport to hold that factor (k) naturally called for consideration of postcrime changes of fundamental views").

Here, respondent contends that there is a reasonable likelihood that the judge's instructions prevented the jury from considering precrime, forward-looking mitigation evidence regarding the possibility that he would lead a constructive life in a prison setting. Not only does the Court's opinion in *Boyde* fail to support the improbable argument that respondent's mitigating evidence falls within factor (k)'s purview, but its reasoning is entirely consistent with the Court of Appeals' contrary conclusion.

Similarly, the Court's recent decision in *Payton* has little bearing here. In *Payton*, we granted certiorari to decide whether the Ninth Circuit's decision affirming the District Court's grant of habeas relief "was contrary to the limits on federal habeas review imposed by 28 U. S. C. §2254(d)." 544 U. S., at 136. In concluding that it was, the Court relied heavily on the deferential standard of habeas review established by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214. See 544 U. S., at 141. And JUSTICE BREYER specifically stated that he only joined the five-Justice majority because "this is a case in which Congress' instruction to defer to the reasonable conclusions of state-court judges makes a critical difference," *id.*, at 148 (concurring opinion), explaining that, were he a California state judge, he "would likely hold that Payton's penalty-phase proceedings violated the Eighth Amendment [because] there might well have been a reasonable likelihood that Payton's jury interpreted factor (k) in a way that prevented it from considering constitutionally relevant mitigating evidence—namely, evidence of his postcrime religious conversion," *ibid.* (citation, alteration, and internal quotation

marks omitted). The fact that *Payton* was a case about deference under AEDPA, rather than about a proper understanding of the scope of factor (k), is cause enough to conclude that it does not mandate any specific outcome here.

Indeed, given that respondent's trial occurred the same year and involved the same jury instructions as Payton's, compare 544 U. S., at 156 ("'[Y]ou shall consider all of the evidence which has been received during any part of the trial in this case, except as you may be hereafter instructed'") (SOUTER, J., dissenting), with App. 183 (same), and because AEDPA does not apply to respondent's case, there are persuasive reasons for concluding that JUSTICE SOUTER's powerful reasoning in *Payton*, rather than the majority's deferential review of a California court's opinion, should guide our decision. In his dissenting opinion, JUSTICE SOUTER pointed out that Payton's trial had occurred both before the California Supreme Court had directed trial judges to supplement the factor (k) instruction and before the legislature had amended it. See 544 U. S., at 158. Without those changes, he correctly concluded, "any claim that factor (k) called for consideration of a defendant's personal development in the wake of his crime was simply at odds with common attitudes and the English language." *Id.*, at 158–159.

Moreover, *Payton* did not deal with a record that discloses actual confusion among jurors, as this record does. See *supra*, at 12–15. Nor did it involve a defense attorney who, bolstering the prosecutor's claim that factor (k) did not allow the jury to consider respondent's religious conversion, refused to "insult" the jury "by telling you I think [the mitigating evidence] excuses in any way what happened here," App. 166. Therefore, even ignoring its significantly different procedural posture, *Payton*, like *Boyde*, falls far short of compelling the result that the Court reaches today.

STEVENS, J., dissenting

## VII

Instead of accepting that lay jurors would almost certainly give the words "circumstance which extenuates the gravity of the crime" their ordinary meaning, the Court insists that they would have disregarded their instructions and considered evidence that had nothing whatsoever to do with the crime. This conclusion seems to me to rest on an assumption that the jury had an uncanny ability to predict that future opinions would interpret factor (k) to mean something that neither the judge nor the lawyers thought it meant. Surely the more natural inference is that the jury followed its instructions. See *Greer* v. *Miller*, 483 U. S. 756, 766, n. 8 (1987) (plurality opinion) (describing our "presumption" that juries follow instructions).

The Court's highly technical parsing of factor (k) depends on linguistic distinctions which would only occur to trained lawyers. See, *e.g., ante*, at 11 (calling attention to the "dichotomy within factor (k) . . . between a legal excuse and an extenuating circumstance"). And even the lawyers are confused. The prosecutor in *Payton* believed that "factor (k) d[oes] not permit consideration of postcrime rehabilitation evidence." *Ante*, at 5. While the majority now blithely characterizes this view as "incorrec[t]," *ibid.*, it is the natural reading of factor (k), and one that jurors would have been likely to accept. Similarly, present-day counsel for the State of California expressed confusion at oral argument as to whether it would have been constitutional for the trial judge to instruct the jury that it could not consider any mitigating evidence unless it extenuated the gravity of the crime, see Tr. of Oral Arg. 8–9 (retreating from the statement that "[i]t would appear not to be" constitutional). The Court cannot seriously insist that a group of 12 laypersons had such command of constitutional law that, anticipating *Skipper*, they took into account evidence outside the ambit of their jury instructions.

The Court also apparently believes that when the prose-

cutor in this case suggested that factor (k) meant exactly what it said, *supra*, at 8, the jury would have taken that as merely a comment on respondent's credibility, *ante,* at 9. But this rests on a clear misreading of the record. Although the prosecutor did argue that respondent lacked sincere religious convictions, he *also* suggested quite powerfully that the law did not permit the jury to consider those convictions, however sincerely held. See App. 155 ("I don't think the law contemplates that *and* I don't think it's right" (emphasis added)). Nor is there any support for the Court's surprising and inherently contradictory view that while the prosecutor here "commented that the law did not contemplate jury consideration of respondent's religious conversion," *ante*, at 10, "*[n]othing the prosecutor said* would have convinced the jury that it was forbidden from even considering respondent's religious conversion," *ibid.* (emphasis added).

Admittedly, as the Court points out, there is a distinction between limiting the jury's consideration "to circumstances *of the crime*" that extenuate its severity, and limiting that consideration to "*any other circumstance* that might excuse the crime," see *ante*, at 7. It is highly unlikely, however, that jurors would note that subtle distinction, and even more unlikely that they would consider it significant. Both interpretations of the phrase focus the jury's attention on the crime, and neither includes the evidence at issue in *Skipper*, which "[a]lmost by definition . . . neither excuses the defendant's crime nor reduces his responsibility for its commission." 476 U. S., at 12 (Powell, J., concurring in judgment). Read however generously, the factor (k) limitation remains unconstitutional.

The Court makes a similarly unpersuasive argument based on the dubious premise that a juror would understand "remorse" to be a species of postcrime evidence that serves to lessen or excuse the crime itself. Even if that

were true, it would not follow that jurors could somehow divine that respondent's evidence of a capacity to redeem himself would both "extenuate his offense and render him less deserving of a death sentence." *Ante*, at 7.[6]

## VIII

Unless the jurors who imposed the death sentence somehow guessed at the breadth of the rule first announced in *Lockett,* that sentence was the product of an unconstitutional proceeding. Ironically, both Chief Justice Burger (who wrote the plurality opinion in *Lockett*) and Justice Powell (who joined it) understood the *Lockett* rule to extend only to evidence "that lessens the defendant's culpability for the crime." *Skipper*, 476 U. S., at 12 (Powell, J., joined by Burger, C. J., and Rehnquist, J., concurring in judgment). Given that the authors of *Lockett* themselves disagreed as to its scope, I am not as sanguine as the Court that the lay members of the jury somehow knew, notwithstanding clear jury instructions, that the testimony presented at the sentencing phase of respondent's trial could be part of the "simple weighing" the jury was supposed to undertake.

When the trial judge told the jurors to consider all the evidence "except as you may be hereinafter instructed," App. 183, he directed them to limit their consideration to the traditional sentencing factors set forth in the statute. When the prosecutor told the jurors that "I don't think the law contemplates" that respondent's religion lessened the

---

[6] In response to the majority's suggestion that this case may be inconsistent with *Johnson* v. *Texas*, 509 U. S. 350 (1993), *ante*, at 16, I note only that *Johnson* addressed a very different question, namely, whether a jury considering future dangerousness could give adequate weight to a capital defendant's youth. Whatever connection may exist between a defendant's youth and his future dangerousness, there is no connection whatsoever between respondent's evidence that he was capable of redemption and a "circumstance which extenuates the gravity of the crime," Cal. Penal Code §190.3(k) (West 1988).

seriousness of respondent's offense, *id.,* at 155, he reinforced the impression that the jury should confine its deliberations to the listing. And once defense counsel *agreed* with the prosecutor, saying that "I'm not going to insult you by telling you I think [the mitigating evidence] excuses in any way what happened here," *id.,* at 166, surely at least some of the jurors would have doubted the propriety of speculating about respondent's future conduct in prison as a basis for imposing a sentence less than death.

The Court today heaps speculation on speculation to reach the strange conclusion, out of step with our case law, that a properly instructed jury disregarded its instructions and considered evidence that fell outside the narrow confines of factor (k). Holding to the contrary, the Court insists, would reduce two days of sentencing testimony to "a virtual charade," *ante*, at 5 (internal quotation marks omitted)—but in so concluding the Court necessarily finds that the judge's instructions were themselves such a "charade" that the jury paid them no heed. I simply cannot believe that the jurors took it upon themselves to consider testimony they were all but told they were forbidden from considering; in my view, they must at the very least have been confused as to whether the evidence could appropriately be considered. That confusion has created a risk of error sufficient to warrant relief for a man who has spent more than half his life on death row. Cf. *Lackey* v. *Texas*, 514 U. S. 1045 (1995) (STEVENS, J., respecting denial of certiorari). The incremental value to California of carrying out a death sentence at this late date is far outweighed by the interest in maintaining confidence in the fairness of any proceeding that results in a State's decision to take the life of one of its citizens. See *Gardner* v. *Florida,* 430 U. S. 349, 358 (1977) (plurality opinion).

Accordingly, I respectfully dissent.